<div style="border:1px solid black; display:inline-block; padding:4px;">Not For Publication</div>

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | | |
|---|---|---|---|
| IN RE: | ) | CASE NO. | 02-33699 (LMW) |
| | ) | | |
| NEW ENGLAND NATIONAL, LLC, | ) | CHAPTER | 11 |
| | ) | | |
| DEBTOR. | ) | | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | | |
|---|---|---|---|
| NEW ENGLAND NATIONAL, LLC, | ) | ADV. PRO. NO. | 11-3058 |
| | ) | | |
| PLAINTIFF | ) | ECF NOS. | 10, 19 |
| | ) | | |
| vs. | ) | | |
| | ) | | |
| TOWN OF EAST LYME, | ) | | |
| | ) | | |
| DEFENDANT. | ) | | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### APPEARANCES

Mark E. Block, Esq.                     Attorney for Movant/Defendant
Amanda L. Sisley, Esq.
Block, Janney & Pascal, LLC
138 Main Street
P.O. Box 310
Norwich, CT 06360


William S. Gannon, Esq.                 Attorney for Plaintiff
William S. Gannon, PLLC
889 Elm Street, 4th Floor
Manchester, NH 03101


### MEMORANDUM AND ORDER RE: MOTION TO DISMISS
### OR ABSTAIN (GRANTED IN PART/ DENIED IN PART)

Lorraine Murphy Weil, Chief United States Bankruptcy Judge

The matters before the court in this adversary proceeding are (a) that certain Defendant's

Motion To Dismiss or for Abstention (ECF No. 10, together with supporting memorandum of law,

the "Dismiss/Abstain Motion")[1] filed by the above-referenced defendant (the "Town") and (b) the

above-referenced debtor's (the "Debtor")[2] objection thereto (ECF No. 19, together with supporting

memorandum of law, the "Objection"). This court has jurisdiction over this dismissal/abstention

matter pursuant to 28 U.S.C. § 1334(b) and that certain Order dated September 21, 1984 of this

District (Daly, C.J.).[3]

## I.    PROCEDURAL BACKGROUND OF THIS ADVERSARY PROCEEDING

The Debtor commenced this adversary proceeding against the Town by complaint (ECF

No. 1, the "Complaint") filed on October 24, 2011.[4] The Complaint did not seek a tax refund from

the Town but, rather, asserted certain "setoffs" against the Town's alleged tax claim discussed below

(see id.). The Complaint is styled "Complaint Amending and Substituted for Debtor's Objection to

---

[1]     References to the docket of this adversary proceeding appear in the following form:
"ECF No. __." References to the oral record of this adversary proceeding appear in the following
form: "Oral Record of __/__/__ Hearing at __." References to the docket of the above-referenced
chapter 11 case appear in the following form: "Case ECF No. __."

[2]     The term "Debtor" as used herein refers to the prepetition Debtor, the Debtor as
chapter 11 debtor in possession, or the reorganized Debtor under the confirmed Plan (as the context
may indicate).

[3]     That order (the "Referral Order") referred to the "Bankruptcy Judges for this District"
inter alia "all proceedings arising under Title 11, U.S.C. , or arising in or related to a case under Title
11, U.S.C. . . . ."

[4]     A prior adversary proceeding by the Debtor against the Town (A.P. # 10-3033, the
"Prior Proceeding") was commenced by the Debtor by the filing of a complaint on May 13, 2010.
A corresponding memorandum and order of even date herewith will issue in that proceeding.
References herein to the docket of the Prior Proceeding appear in the following form: "PP ECF No.
___."

Proof of Claim 13 Filed by the Town of East Lyme."  (*See* ECF No. 1.)  The "Introduction" to the

Complaint states as follows:

> In this Complaint which represents a continuation of the counterclaims first asserted against Defendant in Plaintiff's Amended Objection to the Proof of Claim of the Town of Defendant (Claim No. 13) that became an adversary proceeding pursuant to the Order entered by the United States Bankruptcy Court for the District of Connecticut (New Haven Division), the Plaintiff asks this Court to enter a judgment against Defendant based on its negligence in having hired or appointed Ledge Light Health District ("Ledge Light" or the "Contract Sanitarian") and having failed to supervise and retained the following significant persons within the meaning of this Complaint, among others:  Margaret M. Parulis ("Parulis"), George Calkins ("Calkins"), Edward O'Connell ("O'Connell") and Waller, Smith & Palmer, P.C. ("Waller").  In addition, Plaintiffs seeks a judgment against Defendant, which is vicariously liable for the negligent acts and omissions of its officials and employees.

(ECF No. 1 at 1-2.)  The Complaint further states: "This Court has jurisdiction over the subject

matter of this adversary proceeding under 28 U.S.C. §§ 157 and 1334 . . . .  The cause of action

asserted pursuant to [Bankruptcy] Code Section 542[5] is a core proceeding under 28 U.S.C.

§ 157(b)(2)(A), (C), (E), and (O)."  (ECF No. 1 at 2 ¶¶ 5-6.)

The Complaint sounds in three counts:  First Claim for Relief - Negligent Management and

Supervision of Employees and Independent Contractors; Second Claim for Relief - Negligent

Retention; and Third Claim for Relief - Negligent Hiring of Ledge Light Health District and Calkins.

(*See id.*).  The Complaint further states:

---

[5]      The Debtor's Section 542 allegation is inapposite.  Section 542(b) provides in relevant part as follows:  "[A]n entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee . . . ," 11 U.S.C.A. § 542(b) (West 2013).  However, even a cursory review of the Complaint reveals that the claims asserted therein against the Town are not "matured, payable on demand, or payable on order" and are not within the purview of Section 542. *Cf.* 5 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 542.03, at 542-19 (16th ed. 2012) ("*Collier on Bankruptcy*") ("Such debts commonly include accounts receivable, liquidated judgments or monies held in trust or in escrow.").

> . . . Defendant had a duty to administer its land use ordinances and regulations capably, competently, even-handedly, fairly, impartially, properly and in a timely manner and the manner required by law and refrain from imposing conditions on Plaintiff beyond those within the scope of the Development Rules and Process to avoid damaging, harming or causing loss to Plaintiff in the pursuit of its business activities . . . .
>
> . . . Defendant has a duty and obligation to conduct its business and affairs in accordance with effective, prudent and sound business practices, such as establishing hiring policies, preparing job descriptions and policy and procedure manuals, limiting the scope of their authority and reviewing their performance on a regular basis and complaints when received by an official or department head and that mistakes were made with respect to Plaintiff. Instead, Defendant has hired incompetent and unfit employees, failed to supervise their acts and omissions, promulgate job descriptions or even institute the guidelines, policies or procedures for governing, monitoring or evaluating their performance or disciplining employees who fail or neglect to perform their duties, failed to investigate complaints including those made by Plaintiff and permitted and suffered officials' and employee's negligent acts.

(*Id.* at 3-4 ¶¶ 15, 16.) The Complaint seeks an award of damages from the Town for its alleged breach of the foregoing duties. (*See* ECF No. 1.) At the April 12, 2012 oral argument in this proceeding, counsel for the Debtor stated (in response to the court's question) that the relevant "conduct is both [sic] prepetition, postpetition, and postconfirmation . . . ," (ECF No. 38 at 10:17-19 (statement of Attorney Gannon)).

That certain Joint Pretrial Order issued on November 18, 2011 (ECF No. 8, the "Joint Pretrial Order") provided in relevant part as follows:

- 4 -

TRIAL DATE:   2/6/2012 @ 10:00 a.m.[6]

## JOINT PRETRIAL ORDER

**1. PROCEDURE**

It is determined, pursuant to 28 U.S.C. §157(b)(3), that the above captioned adversary proceeding is a [check one]:

____X[7]____ core proceeding, see 28 U.S.C. §157(b)(2), 11 U.S.C. § 541 [sic] . . . .

**2. PLEADINGS**

a) Answer or Response Date:   **within 30 days of the decision on the motions described in Paragraph 2(d) herein, if any**

b) Other:  Date: Plaintiff to file Motions for Summary Judgment by **March 30, 2012**

c) Plaintiff shall move to add additional defendants (if any) on or before **January 15, 2012**

d) Defendant shall file motions to dismiss on jurisdictional grounds, motions to abstain, motions for revocation of the reference and the like on or before **January 31, 2012**

e) Dispositive motions shall be filed **within 30 days of the close of discovery** . . . .

(ECF No. 8 at 1.)  In accordance with the Joint Pretrial Order, the Town filed the Dismiss/Abstain

Motion on January 30, 2012.  (*See* ECF No. 10.)[8]  In relevant part, the Dismiss/Abstain Motion

(among other things) (a) challenges this court's power to enter a final order under the authority of

*Stern v. Marshall,* 131 S. Ct. 2594 (2011), (b) challenges this court's postconfirmation subject matter

jurisdiction under 28 U.S.C. § 1334(b), (c) seeks dismissal for failure to name one or more

indispensable parties pursuant to Rule 19(a) of the Federal Rules of Civil Procedure and (d) seeks

---

[6]     Here the Joint Pretrial Order refers to a footnote which states: "This date is tentative: **no Trial will be set until any motions described in Paragraph 2(d) herein, if any, are adjudicated."** (ECF No. 8 at 1 n.1.)

[7]     Here the Joint Pretrial Order refers to a footnote which states as follows: **"The Defendant will be contesting jurisdiction and objects to this determination."** (*id.* at n.2.)

[8]     Also in accordance with the Joint Pretrial Order, on the same day the Town filed a motion for the District Court to withdraw the reference from this court under 28 U.S.C. § 157 with respect to this adversary proceeding.  (*See* ECF No. 11.)  That motion now is pending before the District Court.

"permissive" abstention pursuant to 28 U.S.C. § 1334(c)(1).  (*See* ECF No. 10 (Memorandum of Law).)

At a status conference held in this adversary proceeding on February 22, 2012, counsel for the Debtor took the position that this adversary proceeding is "a proceeding to enforce the implementation of the Plan [as hereafter defined]."  (Oral Record of 2/22/2012 Hearing at 11:39:30 *et seq.* (statement of Attorney Gannon).)   The Debtor filed the Objection on February 23, 2012 and (in its supporting memorandum) incorporated related pleadings filed in the Prior Proceeding and also noted that "the parties [have] agreed that this Court could consider the Transcript of the hearing [in the Prior Proceeding] held November 9 and 10, 2011."  (*See* ECF No. 19 at 1 n.2 (Memorandum of Law).)[9]  Oral argument in this matter was held on April 12, 2012.  At that oral argument, counsel for the Town stated that "the arguments that we've made in the . . . [Prior Proceeding], the exhibits and the briefs are incorporated here."  (ECF No. 38 at 9:2-4.)  On September 11, 2012, the court issued that certain Memorandum and Order Re: Submission of Proposed Findings of Material Fact. (*See* ECF No. 47.)  That order required the parties each to submit proposed findings of material fact. (*See id.*)  Both parties complied.  (*See* ECF No. 49 (the Town's proposed findings); ECF No. 50 (the Debtor's proposed findings).)[10]  This matter now is ripe for the decision provided for below.

---

[9]     The November 9, 2011 and November 10, 2011 proceedings in the Prior Proceeding are hereafter referred to as the "Mini-Trial."  A transcript of the November, 9, 2011 proceedings in the Mini-Trial appears in the docket of the Prior Proceeding as PP ECF No. 248.  A transcript of the November 10, 2011 proceedings in the Mini-Trial appears in the docket of the Prior Proceeding as PP ECF No. 249.  References herein to exhibits admitted into evidence at the Mini-Trial appear in the following form:  "Debtor Exh. __" or "Town Exh. __" (as the case may be).

[10]     ECF Nos. 49 and 50 are hereafter referred to collectively as the "Proposed Findings."

## II.    FACTS[11]

### A.    The Case

#### 1.    Through Plan Confirmation

The Debtor commenced the above-referenced chapter 11 case by the filing of a voluntary petition on August 1, 2002.  (*See* Case ECF No. 1.)  The Debtor's bankruptcy schedules disclose the following: (a) real property assets with a stated value of $700,000;[12] (b) personal property assets with a stated value of $15,000; (c) secured claims in the aggregate amount of $696,000.00; and (d) unsecured nonpriority claims in the aggregate amount of $881,442.00.  (*See* Case ECF No. 1 (Schedules).)   The Debtor listed a "dispute[d]" tax lien held by the Town in the amount of $360,000.00 on its Schedule D (Creditors Holding Secured Claims) filed with its petition on August 1, 2002.  (*See id.* (Schedule D).)  On January 23, 2003, the Town filed a proof of claim against the estate in the amount of $417,594.75.  On August 11, 2003, the Town filed an amended proof of claim against the estate in the amount of $440,984.47 ("POC No. 13").[13]

On June 8, 2006, the court issued that certain Order Approving Third Amended Disclosure Statement [the "Disclosure Statement"] and Fixing Date for Filing Acceptance or Rejection of the Third Amended Plan, Objections Thereto, and Confirmation Hearing, Combined with Notice Thereto (Case ECF No. 268).[14]  The Debtor's Third Amended Plan of Reorganization (Case ECF

---

[11]    In finding the facts set forth below, the court has considered the record of this case, the record of this adversary proceeding (including the Proposed Findings) and the record of the Prior Proceeding (including exhibits placed in the record at the Mini-Trial).

[12]    The Debtor's sole real property asset as of the petition date was 16 Mostowy Road, East Lyme, Connecticut.  (*See id.* at 6 (Schedule A - Real Property).)

[13]    Amended POC No. 9-2 originally was filed as POC No. 13.  However, the amended proof of claim now appears in the Claims Register as POC No. 9-2.

[14]    The Disclosure Statement appears in the record as Case ECF No. 260.

No. 259, the "Plan") was confirmed without objection by the Town by order dated August 28, 2006.

(*See* Case ECF No. 277.)  Both the Disclosure Statement and the Plan will be discussed more fully

below.

### 2.    After Plan Confirmation

On April 12, 2007, the Debtor filed that certain Debtor's Motion for Determination of

Debtor's Tax Liability to the Town of East Lyme, Connecticut Pursuant to 11 U.S.C. § 505 or in the

Alternative, Debtor's Objection to Claim No. 13 filed by the Town of East Lyme (Case ECF No. 325

the "Contested Matter").  The Contested Matter stated in relevant part:

> 6.     The Debtor maintains that the amount set forth in Claim No. 13 filed
> by the Town of East Lyme is incorrect and represents an over-assessment of the
> Debtor's real estate and improperly reflects certain unsupported attorney's fees, costs
> and municipal water charges which should be credited back to the Debtor.
>
> 7.     The Debtor maintains that it has numerous claims against the Town
> of East Lyme resulting from certain misconduct, misuse of its regulatory authority
> and other inappropriate actions which have damaged the Debtor economically prior
> to, and during, the Chapter 11 reorganization proceedings.
>
> WHEREFORE, the Debtor respectfully requests that the Court disallow
> Claim No. 13 in full, that the Court establish the true amount, if any, due and owing
> the Town of East Lyme on its tax claim, that the Court find and allow setoff credits
> due the Debtor as a result of the Town of East Lyme's conduct, that the Court
> determine the true tax liability of the Debtor as to the amount and legality of the
> Town of East Lyme's tax pursuant to 11 U.S.C. § 505 and that it have such further
> relief as the Court deems proper and just.

(*Id.* at 2-3.)

Also on April 12, 2007, the Debtor filed an application for a final decree in this case.  (*See*

Case ECF No. 324, the "Final Decree Application".)  *Cf.* Fed. R. Bankr. P. 3022 (discussed below).

The Final Decree Application stated in relevant part:

> 1.     The Third Amended Plan of Reorganization of the Debtor which was
> confirmed by this Court on August 28, 2006 has been duly administered in

accordance with the terms and provisions of said Plan and the Orders of the Court entered on August 28, 2006.

2.    The Debtor has disbursed to the persons entitled to professional fees, pursuant to court orders previously entered, all sums allowed by the court as compensation for rendered and reimbursement of costs incurred for administrative costs and expenses or in the alternative, said professionals have agreed to a payment plan with the Debtor for payments not to exceed the sums authorized by this Court.

3.    To the best of Debtor's knowledge and belief, the Debtor has complied or is complying with all terms of the Debtor's Confirmed Plan of Reorganization.

. . .

5.    Simultaneously filed with this application for final decree is the Debtor's motion objecting to Claim No. 13 filed by the East Lyme Tax Collector in the amount of $440,984.47.  The Debtor's Confirmed Plan of Reorganization provided for this Court to retain jurisdiction on the issue of the claims filed by the Town of East Lyme, including but not limited to, objections to the Town's proofs of claims and/or a determination of tax liability owed to the Town of East Lyme pursuant to 11 U.S.C. [§] 505.  Consequently, the Debtor is seeking a Final Decree in this case specifically reserving continued jurisdiction of this Court after an entry of Final Decree to conduct hearings and decide the issues regarding the validity and amount of the claims made by the Town of East Lyme.  The Debtor had previously paid the claims of the Town of East Lyme as filed by the Town, specifically reserving the right to seek a later determination of this Court as to the validity and amount of the Town's claims and the right to seek disgorgement of any and all amounts previously paid to the Town of East Lyme by the Debtor.

WHEREFORE, Movant prays that a Final Decree be entered herein under the reservation of rights, conditions set forth above and that a time be fixed to expire after such final decree closing this estate . . . .

(*Id.*)

On December 18, 2007, the Debtor filed an objection to POC No. 13 (Case ECF No. 347, the "Claim Objection").  The Claim Objection challenged the propriety of the tax assessment itself and other elements of the Town's tax claim and also alleged that the Town's tax claim was subject to offset on several grounds not related to the tax assessment process as follows:

- 9 -

4.      The claim is subject to offset as a result of those claims against East Lyme acquired from Niantic Real Estate, LLC pursuant to the Confirmed Plan of Reorganization.

5.      The Claim is subject to offset as a result of the Reorganized Debtor's legal fees incurred as a result of East Lyme's conduct both prior to and during the Chapter 11 proceeding.

6.      The claim is subject to offset as a result of East Lyme's breach of contract and other conduct involving good faith implementation of the Reorganized Debtor's Confirmed Plan of Reorganization.

(*Id.*)

On June 18, 2008, the Final Decree Application was marked "off with right to reclaim [to the hearing calendar]" by the Debtor.  (*See* Case Docket entry for June 18, 2008.)[15]  On July 31, 2008, the Debtor filed that certain Debtor's Motion To Amend Motion for Determination of Debtor's Tax Liability to East Lyme or Objection to Claim 13 filed by the Town of East Lyme (ECF No. 325) (Case ECF No. 438, the "Motion to Amend").[16]  The Motion To Amend contained what counsel for the Debtor referred to as an "outline" of offset claims by the Debtor against the Town as follows:

1.      East Lyme and one or more of its elected or appointed officials, employees and agents deliberately, intentionally, knowingly and premeditatedly and negligently interfered with and obstructed the Debtor's efforts to develop its property located within the Town, increased the cost of development by imposing excessive costs, expenses and other fees on the Debtor, delayed development for years until the real estate market collapsed causing the Debtor to sustain significant losses, deprived

---

[15]      A typical reason for a debtor in possession to seek entry of a final decree is to terminate its obligation to pay United States Trustee quarterly fees pursuant to 28 U.S.C. § 1930(a)(6).  The Debtor's counsel (Attorney Novak) did not prosecute (and "marked off") the Final Decree Application because "I met with an objection from the Office of the United States Trustee who did . . . not want me to go forward with the final decree until the Town's claims were satisfied or adjudicated," (PP ECF No. 248 at 54:3-7).  (*See also id.* at 55:7-9) ("There may . . . have been some other reasons [for the U.S. Trustee's Objections], but I can't recall them at the moment.").  As of the date hereof, the Final Decree Application has not been reclaimed to the hearing calendar, no other similar application has been filed and no final decree has been issued in this case.

[16]      The Motion To Amend referred to the Contested Matter.  (*See id.*)

- 10 -

the Debtor of its civil rights under color of state law, and delayed and impaired the implementation of the plan of reorganization confirmed by this Court (the "Plan").

2.      East Lyme and one or more of its elected or appointed officials, employees and agents repeatedly failed to administer the application process timely, fairly and in accordance with the time constraints imposed by state law by, among other things:

A.      Delaying the distribution and submission of plans to other departments for review in order to create a delay in the hearing of subdivision applications.

B.      Contacting abutters to "encourage" their opposition to the Nottingham Hills Subdivision, allegedly as a favor to a friend who lives on Upper Pattagansett Road.

C.      Filing without reasonable justification or cause a cease and desist order which created as a cloud on the title of Nottingham Hills Subdivision Phase I Lots preventing lot sales and creating damages as a result of the unnecessary incurrence of interest and other costs.  The cease and desist was filed illegally as a result of alleged "silt" in an off-site draining swale left unmaintained by the town for period exceeding 20 years.  Incurred, unnecessarily, as a result were over $75,000 in legal, engineering and construction costs relating to the "drainage swale" issue.

D.      Delaying unnecessarily hearings on numerous occasions by withholding comments on subdivision plans until the day of Planning Commission hearings, a tactic which effectively prevented the Debtor and its professionals from preparing responses or revisions to the applicable plans creating further delay.

E.      Delaying the review of applications for public improvement bond returns and reduction and Planning Commission hearings on the applications.

3.      East Lyme and one or more of its elected or appointed officials, employees and agents unlawfully damaged the Debtor by, among other things:

A.      Requiring the "preparation" of ledge controlled septic systems in the Darrows Ridge Subdivision prior to subdivision approval at a cost of $302,000.

B.      The "preparation" requirement imposed by the then Sanitarian, George Calkins, as a condition to subdivision approval was not required by state law or local law.

C.      The Calkins requirements contradicted and exceeded those imposed by the Connecticut State Health Code relating to preparation of ledge controlled septic systems.

- 11 -

D.    Calkins also caused the Debtor additional damage through the misconduct described in sample communications putting the Town on notice of Mr. Calkin's misconduct dated June 3, 2005, June 20, 2005 and June 27, 2005.

4.    East Lyme and one or more of its elected or appointed officials, employees and agents have unlawfully damaged the Debtor by, among other things, delaying, obstructing and increasing the cost of completing the approved public improvements relating to the Mostowy Road realignment by failing to obtain an Army Corps of Engineers permit now alleged to be necessary for the construction.

5.    East Lyme and one or more of its elected or appointed officials, employees and agents have unlawfully damaged the Debtor by, among other things, adopting a subdivision moratorium which interferes with the NEN plan transactions section of the confirmed plan of reorganization. The Planning Commission had and has no legal authority to have enacted or adopt the subdivision moratorium as it knew or should have known. The adoption of the moratorium forced the Debtor to file a proceeding in the New London Superior Court to invalidate the moratorium causing the Debtor to incur unnecessary attorneys fees and other costs and expenses and damage.

6.    East Lyme and one or more of its elected or appointed officials, employees and agents have unlawfully damaged the Debtor by, among other things:

A.    Negligently causing or fraudulently inducing the Town of East Lyme's Conservation Commission to authorize a cease and desist order against the Debtor to prevent the Debtor from constructing the trail required by the Nottingham Hills Phase II and III Subdivision approvals in accordance with the requirements of those approvals, which imposed additional costs on the Debtor and delayed the implementation of the Plan.

B.    Negligently or fraudulently filing a Complaint against the Debtor in the New London Superior Court seeking an injunction without the official approval of the Board of Selectmen.

C.    Retaliating against the Debtor for challenging the validity of the subdivision moratorium by filing the Cease and Desist Order and the Complaint.

(*Id.*)

On December 1, 2008, the Debtor and the Town jointly filed that certain Debtor and East Lyme Joint Motion for Order Approving Partial Compromise (Case ECF No. 472, the "Joint Motion"). The Compromise Agreement that is the subject of the Joint Motion appears in the record

as Case ECF No. 476 (the "Compromise Agreement").  That certain Order Approving Compromise

and Settlement was issued on December 4, 2008.  (*See* Case ECF No. 478.)  The Compromise

Agreement provides in relevant part as follows:

### 3.    Compromised Claims and Retained Actions.

      A.    Subject to the further terms hereof and except as may be expressly provided for herein or limited hereby, the parties hereby compromise by limiting the liability of East Lyme itself and the East Lyme-Related Covenant Parties on account of the following causes of action as provided for herein (collectively the "Compromised Claims"): (a) all of the causes of action asserted against East Lyme itself in the Contested Matter or which could have been asserted against East Lyme or any East Lyme-Related Covenant Party under the facts alleged therein; (b) all of the causes of action asserted against East Lyme itself in the State Court Proceedings or which could have been asserted against East Lyme or any East Lyme-Related Covenant Party under the facts alleged therein.

      B.    Without limiting or intending to limit the breadth of the term "Retained Claims," the Plaintiff specifically reserves any and all Retained Actions, subject to the limitations imposed hereby and the terms hereof including, without limitation: (a) any and all causes of action which Debtor holds or may hold against East Lyme or any East Lyme-Related Covenant Party not specifically compromised hereby or any Third Party, arising from, out of or incidental to any of the circumstances, events or facts underlying the Compromised Claims; and (b) any and all cause or causes of action that Debtor holds or may hold against any Third Party arising from, out of or incidental to any matter, cause or thing.  Nothing contained herein shall discharge, release, relinquish or impair in any manner any cause or causes of action against Margaret M. Parulis, Waller Smith or any other Third Party arising from, out of or incidental to the filing or prosecution of such State Court Proceedings or the failure or refusal of Waller Smith to withdraw from such Proceedings.

. . .

      **4.    Debtor Covenant.**  In order to effectuate the Compromise with East Lyme and East Lyme Related Parties, the Debtor shall execute and deliver to East Lyme for itself and the benefit of the East Lyme Related Parties a document which contains the following covenants (the "Debtor  Covenant"):

      A.    A covenant not to file any further Proceeding against East Lyme or any East Lyme-Related Party on account of any Compromised Claim or Retained Action, except as a nominal defendant or party to the extent reasonably necessary and then only to such extent as may be reasonably necessary to the prosecution of a Compromised Claim or Retained Action against a Third Party and

- 13 -

subject to the further terms and conditions of the Covenant (the "Limited Proceedings Covenant").

        B.    A covenant that limits the monetary liability of East Lyme in the event that Debtor recovers a judgment against one or more Third Parties on account of a Retained Claim as follows (the "Limited Indemnity Liability Covenant"):

        (1)    This covenant shall apply only to a final judgment rendered in favor of Debtor or a Debtor-Released Party against a Third Party (a "Liable Third Party") that obtains a judgment against East Lyme for the payment of all or part of such judgment by way of indemnification, contribution or any other basis (an "Indemnified Third Party," "Indemnity Judgment" and an "Indemnity Claim").

        (2)    In the case of an Indemnity Judgment, Debtor shall not enforce its judgment against the Liable Third Party in any amount in excess of the greater of: (a) the amount of any insurance available to East Lyme with respect to the Indemnity Judgment; or (b) that portion of the Judgment rendered against the Liable Third Party for which such Third Party holds no Indemnity Judgment against East Lyme or an East Lyme-Related Covenant Party.

        C.    It is the intention of this Paragraph 4 that the Debtor may not enforce a Third Party Judgment for which East Lyme may be financially obligated to reimburse to the Liable Third Party until there has been a determination by a court of competent jurisdiction as to the liability of East Lyme or an East Lyme-Related Covenant Party on account of an Indemnity Claim.  East Lyme shall file all pleadings and take all actions necessary to have its indemnity liability determined as part of the proceeding brought against a Third Party by a Debtor to the extent procedurally required or permissible, and shall be deemed and conclusively presumed to have waived its rights hereunder if it fails to do so.  If the indemnity liability of East Lyme to a Liable Third Party cannot be determined in the Third Party Proceeding initiated by a Debtor, then East Lyme file [sic] promptly file all pleadings and take all actions necessary to have its indemnity liability determined and thereafter continuously and diligently seek a final determination of its indemnity liability as promptly as possible, but in no event later than 18 months from the date of the Third Party Judgment subject to such reasonable extensions as may be necessary as a result of delays caused without the consent, participation or fault of East Lyme in the determination of the indemnity liability; provided that, by objective standards, East Lyme has diligently pursued such determination.

. . .

### 7.   Compromise Acts and Documents.

A.   The parties stipulate and agree that:

(1)   Debtor's Motion to Amend the Debtor's Motion to Amend Motion for Determination of Debtor's tax Liability to East Lyme or Objection to Claim 13 Filed By the Town of East Lyme may be granted by the Bankruptcy Court in all respects (the "Amendment Motion" and the "Amended Objection").

(2)   Debtor may further amend the Objection to name specifically Third Parties, including those acting for and as agents of East Lyme, involved in each claim for relief made by the Debtors and may incorporate the acts, actions, omissions and misconduct alleged, which could have been alleged in the State Court Proceedings insofar as they affect these Debtors (the "State Court Claims"), and cause any Third Party to be joined in the contested matter or adversary proceeding to the extent necessary . . . .

. . .

### 16.   Choice of Jurisdiction and Venue.   Actions to enforce, interpret, apply or construe this Agreement shall be brought in the Bankruptcy Court.  The parties consent to the jurisdiction and venue of such Court.  Nothing contained herein shall increase or decrease the jurisdiction retained by the Bankruptcy Court in the NEN Bankruptcy Case in any way or that to be retained by the Bankruptcy Court under any Plan of Reorganization filed by Debtor DR, which is confirmed by the Bankruptcy Court.

(Case ECF No. 476 at 4-6, 8, 12.)

On March 10, 2009, the court issued an order on the Motion To Amend which provided in relevant part as follows: "Pursuant to the terms of Paragraph 7 of the approved Compromise Agreement between East Lyme and the Debtor, the . . . [Motion To Amend] shall be, and hereby is granted . . . . "  (Case ECF No. 509.)  On March 31, 2009, the court issued a consensual order in respect of the Claim Objection which order provided in relevant part as follows:

Without prejudice to the Debtor's right to continue the . . . [Contested Matter] . . . as a contested matter or adversary proceeding in accordance with the Compromise Agreement between the parties as approved by Order of the Court dated December 4, 2008, the Debtor's objection [to POC No. 13] is sustained in part subject to the terms and conditions of such agreement and the order that approved the Compromise Agreement.

- 15 -

(Case ECF No. 515.)  On July 28, 2011, the Debtor filed that certain Motion To Compel [the

Town's] Compliance with Compromise Agreement and Order for Turnover.  (*See* Case ECF No.

621.) That motion was denied on procedural grounds on August 11, 2011. (*See* Case ECF No. 629.)

On July 28, 2011, the Debtor filed a certain Motion for Entry of Scheduling Order for

Debtors [sic] Amended Objection to the Proof of Claim (#13) of the Town of East Lyme Pursuant

to this Court's Order dated March 30, 2009 [sic] (Case ECF No. 618, the "Motion for Scheduling

Order").[17]  On August 16, 2011, the Town filed an Objection and Motion To Dismiss to the Motion

for Scheduling Order (Case ECF No. 632, the "Scheduling Order Objection").  The Motion for

Scheduling Order and the Scheduling Order Objection first came on for a hearing on August 17,

2011.  At that hearing (the "Prior Hearing"), the court directed the parties to submit further briefs

discussing (among other things) issues in respect of *Stern v. Marshall, supra.*  The parties complied.

(*See* Case ECF Nos. 643 (Debtor's brief), 644 (Town's brief), 646 (Debtor's Reply Brief).)  At the

conclusion of the Prior Hearing, the hearing on the Motion for Scheduling Order and the Scheduling

Order Objection was continued to September 26, 2011.  From the arguments and pleadings of the

parties, it appeared to the court that the Town argued (among other things) that the Contested Matter

should be dismissed for reasons including the effect of the Compromise Agreement and/or Rule

19(a) of the Federal Rules of Civil Procedure.  The parties (and the court) also appeared to agree that

there also might be some "*Stern* problem."  The court concluded (and the parties appeared to agree)

that the foregoing issues should not be adjudicated in the context of the purely procedural Motion

for Scheduling Order.  Accordingly, on October 4, 2011, the court issued an order (Case ECF No.

647) which (among other things) directed the Debtor on or before October 24, 2011 to "commence

---

[17]    The Motion for Scheduling Order actually refers to Case ECF No. 515 issued on
March 31, 2009.

an adversary proceeding in this court . . . by filing a complaint . . . naming the Town as defendant

and setting forth the claims 'outlined' in the Motion To Amend . . . ," (Case ECF No. 647 at 4).  As

discussed above, the Debtor complied with that order by commencing this adversary proceeding on

October 24, 2011.

B.        **The Plan and Disclosure Statement; Litigation Supervisor Agreement**

1.        **The Disclosure Statement**

Article 4 of the Disclosure Statement ("Debtor, Its History and Operations; East Lyme

Denials") provides in relevant part:

**4.1    Background.**

A.      New England National, LLC is a Connecticut Limited Liability
Company formed by Robert A. Blatt for the purpose of engaging in the capital
intensive business of buying, owning, developing, marketing and selling real estate
and interests in real estate for profit (hereinafter "Development Business").  Mr.
Robert A. Blatt of Larchmont, New York is the Managing Member of the Debtor.
Mr. Blatt owns Fifty Percent (50%) of the Debtor and the Torrance Family Limited
Partnership owns 50% of the Debtor.

B.      The Debtor had an oral, pre-petition agreement with a non-debtor
company known as Niantic Real Estate, LLC (hereinafter "Niantic") to co-develop
and possibly purchase certain undeveloped real estate (hereinafter "Joint
Development Agreement").  Niantic is a Connecticut Limited Liability Company
whose sole member is Anne K. Torrance, Trustee.  The managing member of Niantic
is Anne K. Torrance, who is represented in this Chapter 11 proceeding by Attorney
William S. Gannon.  Under the Plan, Niantic will sell substantially all of its property
to the Debtor and terminate the [J]oint [D]evelopment [A]greement.

C.      Niantic is a creditor of the Debtor by virtue of loans and money
advances made by Niantic to the Debtor in 2001 and 2002 and by virtue of a court
approved borrowing order pursuant to 11 U.S.C. § 364(b) entered on June 10, 2003
which order allowed the Debtor to borrow up to $350,000.00 in working capital from
Niantic.

D.      During 1998, the Debtor acquired an undeveloped tract or parcel of
land consisting of approximately 200 acres located off Mostowy Road in East Lyme,
Connecticut (hereinafter "Real Property") for the purpose of subdividing or otherwise

- 17 -

dividing the Land into homesites, selling them to the general public and possibly constructing a private golf course . . . .

E.      The Debtor acquired the Real Property by buying the mortgages held by the Federal Deposit Insurance Corporation (FDIC) and then obtaining title by a strict Foreclosure Proceeding in the Superior Court of the State of Connecticut. It paid less than $500,000 for the Real Property. Niantic owns or owned approximately 380 acres of developed and undeveloped land adjacent to the Debtor's 200 acres of undeveloped land. The Debtor's undeveloped land and Niantic's undeveloped land compliment [sic] and enhance the development potential of each parties parcel.

F.      Since 1998, the Debtor and Niantic have had ongoing discussions regarding their respective tracts of land and how each site could be developed in ways which compliment [sic] each other pursuant to a comprehensive development plan. This de facto "master plan" would result in enhanced development and success for both parcels.

G.      In furtherance of this master plan concept, the Debtor and adjacent landowners, including Niantic, began seeking governmental approvals, authorities, licenses and permits necessary for the development of the Debtor's parcel and adjacent parcels (collectively, the "Development Approvals"), including those that must be obtained from the Town of East Lyme, Connecticut ("Town of East Lyme").

H.      Niantic and the Debtor had begun the joint development of their adjacent real estate (the "Development Property" and "Joint Development"). The Debtor firmly believes that East Lyme and certain elected and appointed officials and members of the professional development staffs of the Town's conservation commission and health and building departments (collectively, the "Commissions") have arbitrarily, capriciously, deliberately, pre-and willfully and unlawfully delayed the Permitting Process, and made it far more burdensome and expensive than reasonably necessary in order to prevent the development of the Development Properties for reasons disclosed to East Lyme in earlier versions of this Disclosure Statement and other communications. The Debtor believes that the Town, acting through certain elected or appointed officials and its Commissions and their staff members, have regularly and repeatedly violated the Debtor's civil rights while acting in concert and under color of state law.

I.      In addition, the Debtor believes, that the Town of East Lyme has arbitrarily and knowingly and wilfully imposed and attempted to collect disproportionate and unlawful real estate taxes from the Debtor.

**4.2     Blanket East Lyme Denial.**      Notwithstanding its knowledge of the circumstances, events and facts that gave rise to the Debtor's complaints against East Lyme alluded to rather vaguely in this Article in deference to the Town's Objection to Debtor's Disclosure Statement Pertaining to First Amended Plan of

Reorganization dated April 2, 2004, the Town denies categorically all of the statements made by the Debtor and will presumably defend itself vigorously . . . .

**4.5    Operations During Case.**

A.    <u>Development Activities.</u>  Using the proceeds of the Working Capital Loan [from Niantic], the Debtor continued to prepare and pursue Applications for Development Permits ("Permit Applications") following the Petition Date.  The Debtor believes that East Lyme Land Use staff that [sic] has a policy of delaying and making the Debtor's Permitting Process and the design and construction of the necessary infrastructure as burdensome, difficult and expensive as possible. Although the Debtor finally obtained the Development Permits necessary to create the 80 Sites sold to Vespera in the First Vespera Sale, the Debtor doubts seriously that future Development Permits will be granted more expeditiously than has occurred in the past.

(Case ECF No. 260 at 9-14.)[18]

Article 2 of the Disclosure Statement ("Overview") provides in relevant part:

**2.1    Following Confirmation.**  The Debtor will continue to engage in the business of acquiring, developing and selling real estate in bulk in accordance with its customs and practices and expand into the new, but related areas where it can use its expertise profitably.  The Debtor believes based on the amount of cash on hand that Confirmation will result in the payment of [100% of] the Dividends or Dividends . . . .[[19]]

**2.2    Disclosure Statement Exhibits and Tables.**
. . .

A.    <u>Plan Exhibits</u>.  All Exhibits to the Plan, whether attached thereto or submitted to the Court and Creditors prior to the hearing on the confirmation of the Plan are, and shall be deemed to be incorporated therein by reference as of the date of their submission to the Court.

---

[18]    Certain other provisions of the Disclosure Statement might be relevant (and would be discussed below) but for the fact that they are inconsistent with (and superceded by) the Plan. (*See* Case ECF No. 259 § 13.1 (Conflicts between Plan and Disclosure Statement resolved in favor of Plan).)

[19]    Section 2.1 of the Disclosure Statement also states that 100% of Administrative Claims, estimated to be $100,000, would be paid on the Effective Date.  (*See* Debtor Exh. F2 § 2.1.) As discussed below, that has not occurred.

(*Id.* at 3.)

Article 3 of the Disclosure Statement ("Summary of Plan") provides in relevant part as follows:

> **3.6    Projected Financial Statements Not Necessary.**  Given the fact that the Debtor holds more than $6,000,000 in cash at this time and has relatively few claims that will be paid at confirmation, the Debtor chose not to prepare projected financial statements.  No creditors other than those which are also proponents of the Plan will receive deferred payments.   Since the sophisticated proponents have made an informed decision to establish a long-term relationship with the Debtor and all other creditors will be paid in full, projected financial statements serve no purpose in this case.

(*Id.* at 9.)  Articles 5 ("Significant Property, Reorganization Value and Disposition under Plan"),

6 ("Liquidation Analysis Unnecessary Given First Vespera Closing") and 8 ("Risk Factors;

Feasibility and Best Interests of Creditors") provide in relevant part as follows:

> **5.2    Significant Property.**  For the purpose of this Disclosure Statement, the Debtor has limited its valuation of its Real and Personal Property to cash and other Property believed to have a value of $5,000 or more ("Significant Property").  The Significant Property consists of the Property described in this Section.[20]

> A.    Debtor's Cash on Hand.  Exclusive of working capital, the Debtor has approximately $6,185,451 in cash as of January 1, 2006.

> B.    Real Property in the amount of $1,404,918.

> C.    Development General Intangibles in the amount of $163,836.

> D.    Loans Receivable in the amount of $5,099,292.

> E.    Causes of Action.

> 1.    . . . [T]he Debtor [has] concluded that it has no meritorious Avoidance Actions.

---

[20]    The Debtor's enhanced postpetition asset base resulted from the Niantic Working Capital Loan and the Debtor's postpetition operations (including the First Vespera Transaction).

2.      The Debtor has not yet asserted any Cause of Action against any person in the Court or any other court of competent jurisdiction, but expects that it will have to file one or more adversary proceedings, civil actions or suits against East Lyme . . . . The value of the potential East Lyme Causes of Action is unknown and may not be determinable with any degree of certainty before the time that the Debtor has sold all of its Sites in the Joint Development. Even if the Debtor and its counsel had fully evaluated the merits and probable outcome of the Local Government Adversary Proceeding, it would be imprudent to disclose their internal evaluation . . . .

**6.1    Creditors to be Paid in Full with Interest.** Under the Plan, Creditors holding Allowed Claims will be paid in full, with some interest. The First and subsequent Vespera Sales will produce more than sufficient funds to pay the Dividends becoming due Allowed Creditors.

. . .

**8.      RISK FACTORS; FEASIBILITY AND BEST INTERESTS OF CREDITORS.**

**8.1    Risk Factors and Feasibility.**
. . .

C.      <u>Implementation Not Dependent on Litigation</u>. While serious litigation with East Lyme seems likely given the history of the Debtor's effort to obtain the necessary development approvals, the successful implementation of the Plan is not dependent on success. The Plan requires the Debtor to pay Creditors holding Allowed Claims Dividends irrespective of the outcome of the Local Government Adversary Proceeding. Since the Equity Holders accept the litigation risk and will vote in favor of the Plan to demonstrate their support, the outcome of the East Lyme Proceedings is irrelevant to the feasibility of the Plan.

(*Id.* at 15-19.) Section 8.1 of the Disclosure Statement also states: "The Debtor closed the Vespera Transactions during 2004 and 2005 . . . . The Debtor has enough cash to fund its liabilities under the Plan. As a result the Plan imposes no risk on any creditors other than Mr. Blatt, Torrance Family Limited Partnership and Niantic Real Estate (the "insiders")." (*See id.* at 19; *see also* Debtor Exh. F2 § 8.1.)

- 21 -

2.    **The Plan**

Article 3 of the Plan ("Class Specific Treatment Provisions") provides in relevant part as follows:

**3.1    Class 1 or the East Lyme Tax Claim Class.**

A.    Class Description.  The Class consisted of the Claims for allegedly unpaid real estate taxes, interest and attorney's fees asserted by the Town (the "Real Estate Tax Claims").

B.    Partial Payment in Full Satisfaction of Claim.  Pursuant to the Order entered by the Court approving the partial compromise and settlement entered into by and among Vespera (the "Approved Real Estate Tax Compromise"), the Debtor, Vespera and the Town, the Debtor and Vespera paid this Claim.  A meeting with representatives of the Town resulted in an agreement that the Debtor did not have to discharge, release or relinquish its Causes of Action against East Lyme.  As a result, the Debtor reserved and reserves all of its Causes of Action against the Town and its elected and appointed officials, employees and agents including, but not limited to, claims by the Debtor for reimbursement of taxes paid to date to East Lyme (the "Retained Town Causes of Action") and the "Reservation of Rights").

C.    No Further Dividends or Plan Rights.  No further Dividend shall be paid to the Town.  Further, the Town has and shall have no further claims against the Debtor arising from the Claim in this Class.

**3.2    Class 2 or the Canno Secured Claim Class.**

A.    Class Description.  The Class consisted of the allegedly Secured and Unsecured Claims asserted by Mark Canno ("Canno").

B.    Payment of Canno Claim.  Pursuant to the Approved Canno Compromise, the Debtor satisfied the Claim in this Class.

C.    No Further Dividends or Plan Rights.  No further Dividend shall be paid to Canno.  Further, Canno has and shall have no further claims against the Debtor arising from the Claims in this Class or under the Plan.

**3.3    Class 3 or the Administrative Expense Class.**

A.    Class Description.  This Class of unclassified Claims consists of and includes all Claims held or asserted against the Debtor to the extent entitled to priority under Section 507(a)(1), except for those held by Niantic.

B.      Dividend and Treatment.  The Debtor shall pay each Creditor holding an Allowed Claim in this Class in full within 30 days of the later of (1) the Effective Date[21] or (2) the Allowance Date of the Claim.

. . .

**3.5     Class 4 or the Convenience Claims Class.**

A.      Class Description.  This Class consists of all Creditors holding Unsecured Claims in an amount less than 2% of the total Unsecured Claims asserted against the Debtor (the "Convenience Claims" and "Convenience Claim Ceiling").

B.      Dividend and Treatment.  On the Effective Date of this Plan, the Debtor shall pay each Creditor holding an Allowed Claim in this Class in full, with interest from the Petition Date at the Federal Judgment Interest Rate.

**3.6     Class 5 or the Long Term Unsecured Claims Class.**

A.      Class Description.  This Class consists of, and includes all Creditors holding Unsecured Claims without Priority and such Claims, including those listed in Schedule F to the Petition, except for Convenience Creditors.

B.      Conversion to Long-term Debt.  On the Effective Date, the Allowed Claims in this Class shall be converted to long-term debt as follows:

(1)      The interest that has accrued on each Allowed Claim in this Class at the rate provided for in the document evidencing such Claim shall be capitalized and become part of the principal balance of such Claim as of the Effective date (the "Accrued Interest").

(2)      Each Claim in this Class shall be allowed in the amount claimed by the Creditor in the Proof of Claim filed in this Case, plus the Accrued Interest (the "Allowed General Unsecured Claim").

(3)      Each Allowed General Unsecured Claim shall be paid in full, with interest at a rate which shall be adjusted annually so that it is equal to the rate of interest paid by the United States Treasury the One-year Treasury Note issued on, or nearest to the Effective Date and each anniversary thereof, plus 300 basis points, in 40 consecutive, quarterly installments of principal and interest.

(4)      The Debtor shall execute and deliver to each Creditor holding an Allowed Claim in this Class such amended and restated promissory notes or other

---

[21]      The parties do not dispute that the Effective Date has occurred.

documents as may be necessary to *evidence* the Debtor's obligation to pay the Allowed Claims in this Class.[22]

**3.7     Class 6 or the Equity Interests Class.**

A.     Class Description. This Class includes all of the holders of the issued and outstanding equity interests in the Debtor and any persons or entities claiming by, through or under any of them (the "Equity Interests" and "Equity Holders", respectively).

B.     Retention of Equity. The Equity Holders shall retain their equity interests in the Debtor subject to the security interests to be granted to the Agent.

**3.8     Administrative Expense Claims.**

These claims consists of the Claims held by the Debtor's counsel and all other Claims entitled to priority under Code Section 507(a)(1), including any post-petition held by the Town. Allowed Claims in this group will be paid on the later of (1) the Effective Date, (2) the Allowance Date or (3) the date on which such Claim becomes payable under State Law.

(ECF No. 259 at 6-9 (emphasis added).)

Article 5 of the Plan ("Post-Confirmation Debtor, Ownership[,] Management and

Operations") provides as follows:

**5.1     Post-confirmation Ownership.** Following Confirmation, Robert Blatt and Torrance Family Limited Partnership will own all of the membership interests in the Debtor (the "Equity Holders").

**5.2     Amendment of Operating Agreement.** On or before the Effective Date, the Members shall amend the Debtor's Operating Agreement as follows (the "Modified Operating Agreement"):

A.     The Debtor shall change its name to "Niantic Capital Partners LLC."

B.     The principle [sic] or primary business purposes and powers of the Debtor shall be expanded to include the Expanded Business Purposes described in this Plan.

---

[22]     The foregoing emphasized language supercedes Section 3.4.B.(5) of the Disclosure Statement.

**5.3    Expanded Business Purposes.**  Without limiting the Debtor's ability to continue its original business of buying and developing real estate for sale to developers in bulk sales, the Debtor intends to, and shall expand its business to include the following activities and operations in its own name or one or more wholly-owned pass-through affiliates:

A.    The formation of one or more wholly owned, pass-through affiliates.

B.    The acquisition and "banking" or retention of income-producing real estate and undeveloped real estate and interests therein for future development that qualifies or may be reasonably expected to qualify for long-term capital gains treatment when sold or otherwise disposed of by the Debtor for cash or credit or through like-kind exchanges or any combination thereof and on such terms and conditions as the Members, acting in accordance with the Judgment Standard, may deem to be in the best interests of the Allowed Creditors and the Members.

C.    Making participating mortgage loans to borrowers on such terms and conditions as the Members, acting in accordance with the Judgment Standard, may deem to be in the best interests of the Allowed Creditors and the Members.

D.    Investing in, or lending to or purchasing claims against other debtors and distressed companies engaged in the real estate business and other companies as the Members, acting in accordance with the Judgment Standard, may deem to be in the best interests of the Allowed Creditors and the Members.

E.    Purchasing claims, demands, causes of action and equitable and statutory rights against creditors of the Debtor and other third parties or interests therein on such terms and conditions as the Members, acting in accordance with the Judgment Standard, may deem to be in the best interests of the Allowed Creditors and the Members.

F.    Funding public interest litigation intended to improve the real estate development climate, including those intended or reasonably calculated to (1) make the local approval process conform to the federal, state and local ordinances and administrative regulations governing or regulating real estate development, (2) ensure that local governments appoint and hire only persons qualified under the law and their experience and training to administer those aspects of the development process to be within the scope of their duties and that its officials administer the approval process in a knowledgeable, fair and even-handed and timely manner consistent with the instructions of the agencies, boards and commissions which they serve and (3) make the local approval process open and transparent.

**5.4    Post-confirmation Management.**  Robert A. Blatt shall continue to be the Manager of the Debtor (the "Manager") and have full authority for the day to day management of the Debtor subject to the limitations imposed by this Plan and the

Operating Agreement, as modified pursuant to this Plan, and the direction and control of a majority of the members as provided for in the Operating Agreement.

**5.5     Plan Covenants and Restrictions.**  Until such time as the Debtor shall have paid all of the Dividends due Allowed Creditors under this Plan other than the Long Term Unsecured Creditors, the Debtor:

(1)     Shall not redeem or make any payment or distribution on account of any Equity Interest in the Debtor.

(2)     Shall not merge into or consolidate with or into any other entity other than Niantic unless (1) the successor entity assumes the Debtor's rights and duties under this Plan; and (2) the Debtor is not then in default of any provision of this Plan.

(3)     Shall keep true, complete and accurate records and books of account in accordance with generally accepted accounting principles to the extent determined to be applicable.

(4)     Shall cause its accounting firm to provide Allowed Creditors who have not yet been paid with a copy of the Debtor's compiled financial statement within 90 days of the Debtor's year end.

**5.6     No Other Limitations.**  Except as specifically limited by this Plan, the reorganized Debtor shall have full and complete authority to manage its business and affairs as it deems to be prudent subject only to its Modified Operating Agreement, as amended, this Plan and applicable federal and state law.

(ECF No. 259 at 10-13.)

Article 7 provides for a "Working Capital Reserve" as follows:

**7.1     Working Capital Reserve.**  No later than the Effective Date, the Debtor shall open an interest bearing account with a Qualified Depository to create a working capital reserve in such amount as the Debtor deems necessary for the payment of such costs and expenses as it incurs in the ordinary course of business, including the Debtor's Post-petition Tax Liabilities, the fees and expenses of Development Professionals, the fees and expenses of Special Counsel and money due Niantic under the terms of the Joint Development Agreement (the "Permitted Working Capital Uses"), but in no event less than $4,000,000 on the Effective Date (the "Working Capital Account" and "Working Capital Reserve").  The Debtor shall deposit all

sums retained from Funding Transactions[23] as Working Capital into such Account.
The debtor shall not use the Working Capital for any purpose other than a Permitted
Working Capital Use. If and to the extent that the Working Capital Account has
more money than any unpaid Creditor holding an Allowed Claim believes to be
necessary at any time, such Creditor may request the Court to issue an order requiring
the disbursement of some of the Working Capital Reserve as Dividends from time
to time.

(ECF No. 259 at 13.)

Article 8 of the Plan ("Continued Acquisition and Development of Real Estate for Bulk Sales

to Affiliated and Unaffiliated Buyers") provides in relevant part as follows:

**8.1    Continuation of Pre-petition Business in Ordinary Course.** The Debtor
shall continue its efforts to obtain the local and state Development Permits necessary
for the conversion of its real estate into Sites for the construction of buildings and
other improvements in the ordinary course of its business, including its historical
customs, policies and practices. The Debtor shall file and prosecute to issuance all
necessary applications and requests for Development Permits ("Development
Applications") as diligently as may be reasonably possible. The Debtor may also file
such civil actions, suits and other proceedings as may be necessary to secure
Development Permits to which the Debtor is entitled under local, state and federal
law. Except as expressly prohibited or limited by this Plan, the Debtor may take or
refrain from taking such other actions as the Debtor may deem to be necessary,
prudent or appropriate in connection with the development of its Real Estate.

(ECF No. 259 at 14.) Article 8.5 requires Niantic to sell and the Debtor to purchase certain real

property assets and real property related assets. (*See id* at 15-16.)

Article 10 of the Plan ("Proceeding and Causes of Action") provides in relevant part as

follows:

**10.1    Definitions Related Primarily to this Article.**

A.    "Retained Causes of Action" means any and all Causes of Action now
or hereafter held by the Debtor against any person or entity, except for those

---

23    The Plan defines "Funding Transactions" with respect to "Net Proceeds" to mean:
"A Funding Proceeding or any other Cause of Action, the Proceeds of any settlement with, or
judgment, less the attorney's fees, expert fees and any other costs and expenses reasonably incurred
in connection with the Proceeding or collection of the Proceeds." (ECF No. 259 at 5 § 2.1.A.(12)(b).)

specifically compromised or settled pursuant to an Order entered by the Court during this Case or pursuant to this Plan, if any ("Settled Causes of Action").

B.        "Supervised Causes of Action" means the Causes of Action asserted against the . . . [Town] . . . .

**10.3    Litigation Supervisor Agreement.**  On the Effective Date, the Debtor and Mr. Robert A. Blatt shall enter into a Litigation Supervision Agreement in substantially the same form as that attached hereto (the "Litigation Supervisor" and "Litigation [Supervisor] Agreement").  The Litigation Supervisor shall thereafter administer, manage and supervise the Supervised Causes of Action in accordance with the terms of such Agreement and distribute the Net Proceeds made in or on account of such Actions to Unsecured Creditors as provided for in the Agreement attached hereto as Exhibit A.[24]

. . .

**10.5    Retained Proceedings and Causes of Action.**  The Debtor shall retain and may prosecute, compromise and settle or reduce to judgment in accordance with the Judgment Standard any and all Retained Causes of Action that it has, may have or might have against any person or entity including, without limitation, the following:

. . .

B.        Causes of Action against the . . . [Town] (the "Town Proceedings") including, without limitation, those seeking compensatory, enhanced and statutory damages based on the its [sic] violation of the Debtor's civil rights under color of state law subject to the terms of the Litigation Agreement and this Plan.

**10.6    Retention and Compensation of Counsel.**

A.        The Confirmation Order shall automatically authorize the Debtor to retain John Williams, Esq., Paul Geraghty, Esq. and William S. Gannon, Esq. to represent it in connection with the Causes of Action to be asserted against the Local Government on the . . . Modified Contingent Fee Basis [provided for hereinbelow] . . . .

B.        With prior Bankruptcy Court Approval, the Debtor may retain other counsel to represent its interests in other Retained Causes of Action on such terms and conditions as may be approved by the Court.

---

[24]        The Litigation Supervisor Agreement was annexed as an exhibit to the Plan (*see* Case ECF No. 259 (Exhibit A)), and is described more fully below.

- 28 -

**10.7   Settlement Approval.** Court Approval shall be required for any compromise or settlement entered into by the Debtor and any other person or entity following Confirmation.

**10.8   Recoveries.** Net Recoveries made on account of any Retained Cause of Action shall be paid to Creditors in accordance with the terms of this Plan or retained by the Debtor if it has paid in full the Dividends due Allowed Creditors hereunder.

(Case ECF No. 259 at 17-19.)

Section 12.1.B. of the Plan provides as follows: "The Debtor will make all Dividend Payments becoming due under this Plan except for those to be paid by the Litigation Supervisor pursuant to the Litigation Supervisor Agreement," (*id.* at 21). Article 14 ("Effect of Confirmation") provides in relevant part as follows:

**14.3   Discharge and Other Relief.**

A.   Except as otherwise provided in the Plan or the Confirmation Order, the Debtor shall be discharged, pursuant to Section 1141(d)(1) of the Bankruptcy Code, from all Claims and debts that arose prior to the Confirmation Date, and any debt of a kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code. . . .

**14.4   Title to Property of the Estate.** On the Effective Date of this Plan, title to all of the Property of the Estate shall be vested in the Debtor free and clear of all Liens, except for the Preserved Liens and as otherwise expressly provided for in this Plan.

**14.5   Jurisdiction to be Retained by Court.**

A.   The Court shall retain jurisdiction over this case to the extent consistent with its customary and usual practice.

B.   In addition, the Court will retain jurisdiction to hear and enter orders on or resolving disputes or disagreements arising or filed prior to the entry of the Final Decree in this Case with respect to:

(1)   Applications for awards of Administrative Expenses; [sic]

(2)   Avoidance Actions and other rights created by the Code ("Code Rights"), adversary proceedings, contested matters, compromises and/or abandonments of any Property of the Estate involving or pertaining to the

implementation of this Plan, including those over which the Court has or would have had jurisdiction, but for Final Confirmation.

>       (3)     Any Proceedings based on Retained Causes of Actions.

>       (4)     Disputes with the Town of East Lyme regarding or arising from its enforcement of its so-called land use regulations, including constitutional challenges thereto or civil rights litigation arising therefrom to the fullest extent permitted by law.

>       (5)     The implementation or enforcement of this Plan.

(Case ECF No. 259 at 28-29.)

>       **3.      Litigation Supervisor Agreement**

As noted in the Disclosure Statement, the Litigation Supervisor Agreement was incorporated by reference into the Plan. (*See* Case ECF No. 260 at 3 § 2.2.A.) To the extent not described in the Plan and Disclosure Statement as set forth above, the Litigation Supervisor Agreement provides in relevant part as follows:

>       **2.1      Purpose of Agreement.** The Parties [*i.e*, the Debtor and Mr. Blatt] hereby enter into the Agreement for the purposes of managing and liquidating the Causes of Action in the manner described in the Confirmed Plan and this Agreement and as otherwise required by the law of the State with the objective of maximizing their value by:

>       A.      Causing the Debtor to commence appropriate civil actions, equity procedings [sic], suits and other actions (collectively, "Proceedings") against those persons against whom the Debtor believes that it has meritorious Causes of Action (the "Proceedings"), including the Town of East Lyme, Connecticut ("East Lyme") and then managing and supervising the prosecution of such Proceedings and any efforts made to compromise and settle such Proceedings for the benefit of the Beneficiaries as if the Supervisor was the owner and holder of such Causes of Action;

>       B.      Funding the prosecution of the Proceedings by lending the Debtor up to $250,000 on a non-recourse basis and otherwise the terms set forth or discussed in the Confirmed Plan;

>       C.      Distributing the net proceeds therefrom in accordance with the terms of the Confirmed Plan; and

- 30 -

D.    Engaging in, doing or causing to be done and executing or causing to be executed such activities, acts and documents as may be consistent with, and reasonably necessary for the accomplishment of the purpose and objectives of the Plan and this Agreement or incidental thereto.

2.2    **Supervisor to Act in Name of Debtor.**  In carrying out, discharging and performing the Supervisor's duties and responsibilities hereunder, the Supervisor shall act in the name and on behalf of the Debtor for the purpose of implementing such portions of the Confirmed Plan as require the reduction of the Causes of Action to settlement or judgment and the distribution of the Net Proceeds or Recoveries derived therefrom.

2.3    **Administration of the Causes of Action.**    Subject to such Bankruptcy Court Approvals as may be required by the Confirmed Plan and this Agreement and the other terms and conditions of such Plan and this Agreement, the Supervisor:

A.    Shall manage and have the sole and exclusive authority for the administration, management and supervision of the Proceedings, including the execution of settlement agreements, the collection of the Proceeds of compromises, settlements and judgments, the investment and reinvestment of the Net Proceeds thereof and to administer, invest and reinvest all of the Causes of Action, collect the income therefrom, and distribute the Proceeds of the Causes of Action.

B.    With respect to the Causes of Action only, the Supervisor shall fulfill the duties of the Debtor and its Management to the Beneficiaries under the terms of the Confirmed Plan.

3.    **Duties, Rights and Powers of Supervisor.**

3.1    **Supervisor's Duties.**  The Supervisor shall, at the direction of the Debtor, manage the Estate and the Causes of Action, collect the income and make Distributions, including final Distributions, as provided under the confirmed Plan and shall thereupon take such steps as provided herein and as otherwise necessary and proper to close the Case in accordance with applicable law.

(Case ECF No. 259, Exh. A at 2-4.)  Section 3.2 of the Litigation Supervisor Agreement sets forth

the Litigation Supervisor's "Rights and Powers."  (*See id.*)

The Litigation Supervisor Agreement further provides:

3.3    **Required Bankruptcy Court Approvals.**  The Supervisor shall not enter into any compromise or settlement agreement pertaining to any Cause of Action

that shall become effective or binding on the Debtor and the Estate without
Bankruptcy Court Approval.

. . .

     **3.9      Reports and Fees.**  To the extent required by the Bankruptcy Court,
the Supervisor shall provide quarterly statements of receipts and disbursements to the
Debtor, such reports to be based upon a calendar year.

. . .

     **4.1      Distributions.**    The Supervisor shall distribute Net Proceeds or
Recoveries to Beneficiaries on a pro rata basis in the order of preference and priority
enjoyed by the Classes under the Confirmed Plan without the necessity of approval
of the Bankruptcy Court after: (i) [sic] payment or provision for payment of the
Supervisors supervisory costs and expenses and tax liabilities, as reasonably
estimated by the Debtor's accountants at such times and in such amounts as required
thereby and shall make such additional Distributions with the oversight of the Debtor
in accordance with the Confirmed Plan.

. . .

     **5.4      Successor Supervisor.**  In the event that a Supervisor is removed,
resigns, or otherwise ceases to serve as Supervisor, a successor Supervisor shall be
appointed by the Debtor, subject to approval by the Bankruptcy Court.

. . .

     **7.1      Termination of the Agreement.**  The Agreement will terminate only
upon authorization of the Bankruptcy Court.

     **7.2      Amendment of Agreement.**  Except as otherwise set forth herein, any
provisions of the Agreement may, consistent with the terms of the Confirmed Plan,
be amended, modified, terminated, revoked or altered only upon Bankruptcy Court
Approval.

. . .

     **8.4      Conflicts between Confirmed Plan and Agreement.**  Should there
be any conflict or apparent conflict between any provision of this Agreement and the
Confirmation Order and the Confirmed Plan, the conflict shall be resolved in favor
of the Confirmation Order and Confirmed Plan.

(Case ECF No. 259, Exh. A at 4-10.)

     C.    <u>**Additional Facts**</u>

     At the time the Debtor filed its petition, its members were Robert Blatt and the Torrance

Family Limited Partnership.  (*See* Case ECF No. 1 at 29 ("List of Equity Security Holders").)  At

- 32 -

the time the Debtor filed its petition, among its unsecured creditors were: (a) Niantic in the amount

of $7,000 (*id.* at 11 (Schedule F));[25] (b) Torrance Family Limited Partnership in the amount of

$326,901 (*see id.* at 29 (Schedule F));[26] and (c) Anne Torrance, Trustee (for the four Torrance

children trusts) in the amount of $491,400 (*see* Case ECF No. 1 at 29 (Schedule F))[27] and PP ECF

No. 249 at 22:5-16).   Niantic's members and/or managers are as follows: (i) Jeffrey Torrance, the

manager of Niantic (PP ECF No. 249 at 17:19-20); (ii) the original members of Niantic, the Torrance

Family Limited Partnership and four trusts set up for Jeffrey Torrance's then minor children (*id.* at

18:1-9); and (iii) Robert Blatt who acquired a 50% ownership in Niantic in 2005 (*id.* at 18:10-21).

The aforementioned creditors have been referred to as "long-term unsecured creditors," "insider

creditors," "insiders" and "affiliated entities" at various times.   (*Id.* at 36:9-37:13, *id.* at 63:18-24).

Golf Course Investors of New Hampshire was also listed as an unsecured creditor (Case ECF No. 1

at 29 (Schedule F)).[28]   Golf Course Investors of New Hampshire is also a Blatt/Torrance Entity and

the Debtor holds a mortgage from this entity.   (*See* PP ECF No. 249 at 30:19-32:6.)

As of March 29, 2006, the Debtor had more than $6,000,000 in cash on hand.   (*See* Case ECF

No. 260 at 9, 18-19.)   The $6,000,000 in cash that the Debtor had was more than sufficient to pay

all creditors in full, and still keep a $4,000,000 working capital reserve.   (*See* Debtor Exh. A2

---

[25]     On February 12, 2003, Niantic filed an amended proof of unsecured nonpriority claim
in this case in the amount of $16,000 for an equipment lease(s).   (*See* Claims Register (POC # 11-1).)

[26]     On December 16, 2002, the Torrance Family Limited Partnership filed a proof of
unsecured nonpriority claim in that amount for "[m]oney loaned."   (*See* Claims Register (POC # 7-
1).)

[27]     On December 16, 2002, Ann K. Torrance, Trustee filed a proof of unsecured
nonpriority claim in that amount for "[m]oney loaned."   (*See* Claims Register (POC # 8-1).)

[28]     On February 12, 2003, that creditor filed an amended proof of unsecured nonpriority
claim in the amount of $20,000.00 for "[m]oney loaned."   (*See* Claims Register (POC # 12-1).)

(Claims Register) (total claims filed in the aggregate amount of less than $2,000,000.00); PP ECF

No. 249 at 26:12-27:1.)  The "sophisticated proponents [*i.e.,* Blatt and Torrance related inside

creditors] . . . made an informed decision to establish a long-term relationship with the . . . creditors."

(Case ECF No 260 at 9 § 3.6; *see also* PP ECF No. 248 at 83:22–84:22.)   Attorney Novak

voluntarily agreed to allow his administrative claims to be paid after the Effective Date.  (*See* PP

ECF No. 248 at 38:20–39:1.)   None of the money received by the Debtor from postpetition

investments nor any of the $350,000 in settlement funds received from the Town pursuant to the

Compromise Agreement went toward the money owed to Attorney Novak.  (*See* PP ECF No. 249

at 77:23-78:20.)   On the Effective Date (or shortly thereafter), all of Niantic's real estate was

transferred and the Debtor had assumed management of all of the property that was to be transferred

under the Plan.  (*See* PP ECF No. 249 at 24:15-24, 29:13-30:4.)   "[T]he conduct [alleged in the

Complaint] is both [sic] prepetition, postpetition, and postconfirmation . . . ," (ECF No. 38 at 10:17-

19 (statement of Attorney Gannon)).

On the Effective Date, or shortly thereafter, the long-term creditor distributions were

commenced.  (*See* PP ECF No. 249 at 74:1-14).  As of the Effective Date, all of the Class 1 (Town

of East Lyme) and Class 2 (Mark Canno) creditors had been paid in full.  (*See* Case ECF No. 260

at 18; PP ECF No. 248 at 47:16-24, 49:15-19.)   On the Effective Date (or shortly thereafter) all

"outside" creditors, except for Attorney Novak, were paid in full.  (*See* PP ECF No. 249 at 36:16-

21).  After the Effective Date, the inside creditors renegotiated the terms of repayment of their claims

on one known occasion to allow the Debtor to invest its working capital in one or more business

ventures without approval of the bankruptcy court.  (*See* PP ECF No. 248 at 71:23-76:21, 105:11-

106:8, 109:19-110:17; PP ECF No. 249 at 28:14-29:8, 59:4-15, 74:1-78:20.)   Instead of payment of

- 34 -

those long term claims, the Debtor deployed the cash on hand/working capital into new investments

and acquisitions.  (*See* PP ECF No. 248 at 105:16-19; PP ECF No. 249 at 29:1-8.)

The Compromise Agreement provided that the jurisdiction retained by this Court under the

Plan remained intact notwithstanding its terms.  (*See* Debtor Exh. N2 ¶ 16.)  Under the terms of the

Compromise Agreement, the Debtor retained "any and all causes of action" which it held or might

have held against East Lyme . . . , "including the Compromised Claims." (*See id.* ¶ 2.I.)  Town of

East Lyme First Selectman Paul Formica testified as following during his deposition taken on

September 15, 2011:[29]

> Q.    Did you understand that the Compromise Agreement required that East Lyme
>       continue to be a defendant [in the pending Proceedings]? . . .
> A.    To a certain extent.
> Q.    Was the certain extent the limits of the insurance coverage available under
>       the AIG policy or policies? . . .
> Q.    Anyway, what did "to an extent" mean?
> A.    To an extent that the limits of the insurance policy would cover . . . .

(Case ECF No. 644, Ex. L at 165:8-24.)

The Debtor has filed Monthly Operating Reports for every month following the confirmation

of the Plan in generally the same form as Debtor Exh. K2, each of which disclose that Attorney

Novak has not been paid in full, not all of the Debtor's real estate has been sold and that not all

claims have been resolved, including the "pending claim objection . . . [versus] Town of East Lyme."

(*Id.*; *see also* PP ECF No. 248 at 134-35, 137-39.)  The Debtor has not paid more than $1,000,000

in dividends due creditors because it became illiquid as a result of investments made, mortgages and

land, such as the approximately 50 acre Osso property acquired for the purpose of developing a

housing project and now an affordable housing project, as part of the Expanded Business Operations

---

[29]    The Debtor does not have a copy of the Formica Deposition Transcript.

provided for in the Plan, and needed to retain its cash as working capital to continue its development

work.  (*See id.* at 84, 86 and 87-89.)  Following confirmation, the Debtor tried to develop the 50-acre

lot created from smaller properties as contemplated by Section 8.4 of the Plan, but could not get the

approvals needed for an affordable housing project in late 2006 or early 2007 (*see* PP ECF No. 249

at 44-45), and an age restricted housing project and an incentive housing district project during 2009

(*see* PP ECF No. 248 at 45).

The Debtor had an offer of $2,600,000 for the 50-acre lot following confirmation.  (*See* PP

ECF No. 249 at 50-51.)  The 50-acre lot represents 65-70% of the total value of the real estate owned

by the Debtor on the date of confirmation.  (*See id.* at 52.)  The Debtor still owns the Osso Property,

but has not been able to develop it due to its inability to obtain the necessary permits from the Town

before the "market crashed."  (*See* PP ECF No. 248 at 89, 131; PP ECF No. 249 at 68.)[30]

III.    **ANALYSIS**

      A.    **Subject Matter Jurisdiction**

           1.    **Legal Background**

                a.    **In General**

Ordinarily, this court has a duty to confirm its subject matter jurisdiction before proceeding

any further.  *See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,* 109 F.3d 105,

107-08 (2d Cir. 1997).  *See also Cody Inc. v. County of Orange, et al. (In re Cody, Inc.),* 281 B.R.

182, 189 (S.D.N.Y. 2002), *aff'd in part, appeal dismissed in part,* 338 F.3d 89 (2d Cir. 2003)

(determining that bankruptcy court should have determined the existence of subject matter

---

[30]    In its Proposed Findings, the Debtor claims that "[t]he Debtor has transferred less than 40% of the property contemplated [to be sold] by the Plan."  (*See* ECF No. 50 at 6 ¶ 32.) However, the Debtor provides no citation to the record to support that proposed finding. Accordingly, the court declines so to find.

jurisdiction before deciding to abstain). *Cf. Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83

(1998) (finding that court should determine jurisdiction before proceeding to the merits).

Accordingly, the issue of subject matter jurisdiction will be considered here as an initial matter.

"The [Supreme Court's] holding in *Stern v. Marshall* did not concern the subject matter

jurisdiction of the bankruptcy court, but rather, the allocation of the authority as between the district

court and the bankruptcy court to enter final judgments." *Empire State Bldg. Co. LLC v. New York*

*Skyline, Inc (In re New York Skyline, Inc.),* 471 B.R. 69, 79 (Bankr. S.D.N.Y. 2012) (citation

omitted). "That allocation does not implicate questions of subject matter jurisdiction." *Id.* (citation

and internal quotation marks omitted). With respect to true issues of subject matter jurisdiction, the

burden is on the plaintiff to prove such jurisdiction by a preponderance of the evidence. *See*

*Vanguard Prod. Corp. v. Citrin (In re Indicon, Inc.),* No. 11-5133, 2012 WL 1110115, at *2 (Bankr.

D. Conn. Mar. 30, 2012 (Shiff, J.). Subject matter jurisdiction cannot be conferred on federal courts

through consent or waiver. *Universal Consol. Cos., Inc. v. Bank of China,* 35 F.3d 243, 247 (6th Cir.

1994). *See also Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S.

694, 702 (1982). An absence of subject matter jurisdiction may be raised for the first time at any

point in the proceedings (even on appeal). *See Yong Qin Luo v. Mikel,* 625 F.3d 772, 775 (2d Cir.

2010).

Section 157 of title 28 of the United States Code, which concerns certain "[p]rocedures" to

govern the allocation of bankruptcy work between the district courts and the bankruptcy courts,

provides in relevant part as follows:

(a) Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.[31]

(b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

  (2) Core proceedings include, but are not limited to–

   (A) matters concerning the administration of the estate;
. . .

   (C) counterclaims by the estate against persons filing claims against the estate;
. . .

   (E) orders to turn over property of the estate;
. . .

   (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims . . . .

(c)(1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

(2) Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.

---

[31]     As noted above, the District Court for this District has made that reference pursuant to the Referral Order.

28 U.S.C.A. § 157 (West 2013). Thus, Section 157 permits a bankruptcy judge to issue final orders or a final judgment in a "core proceeding," but does not permit a bankruptcy judge to do so in a non-core proceeding (absent consent of the parties).

> In determining whether a proceeding is core or non-core, both the form and substance of the proceeding must be examined. The critical focus of the inquiry as to whether a proceeding is core is not on who is bringing the lawsuit but what the lawsuit is about.

*Hudgins v. Systems Eng'g & Energy Mgmt. Assocs., (In re Systems Eng'g & Energy Mgmt. Assocs.),* 252 B.R. 635, 643 (Bankr. E.D. Va. 2000) (citations and internal quotation marks omitted). The core/non-core determination is made on a claim-by-claim basis. *See id.* at 642-643. *Contra Germain v. Connecticut Nat'l Bank (In re O'Sullivan's Fuel Oil Co., Inc.),* 88 B.R. 17 (D. Conn. 1988) (Dorsey, J. (approving proposed decision by Krechevsky, J.)).

It is the plaintiff's burden to demonstrate that a proceeding is a "core proceeding." *See* Fed. R. Bankr. P. 7008 ("[T]he complaint . . . shall contain a statement that the proceeding is core or non-core . . . ."). However, when applied to a specific situation, were a specific subsection of Section 157(b)(2) to violate the limitations set forth in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50 (1982) ("*Marathon Pipe*"), on a bankruptcy judge's power to enter final orders or final judgments in a proceeding, such subsection would be unconstitutional as applied. *See Stern, supra* (Section 157(b)(2)(C) held unconstitutional as applied to the counter-claim(s) there at issue.). Finally, because a district court cannot refer a proceeding over which it has no jurisdiction, Section 157 *a priori* assumes that the district court has such jurisdiction.

The bankruptcy jurisdiction of the district courts is a creature of Section 1334 of title 28 of the United States Code which provides (in relevant part) as follows:

> (a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

- 39 -

(b) Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11 . . . .

28 U.S.C.A. § 1334 (West 2013).

As discussed above, *Stern* does not implicate the district court's subject matter jurisdiction. Accordingly, it is appropriate for the court first to consider its subject matter jurisdiction (which, as explained above, derives from that of the district court). Only after confirming the existence of that jurisdiction should this court proceed to the *Stern* or other issues. That approach is followed below.

**b.    Subject Matter Jurisdiction Vel Non Under Section 1334(b)**

**i.    Preconfirmation Jurisdiction**

Section 1334(b) provides for three types of district court jurisdiction over bankruptcy proceedings: "arising under" jurisdiction; "arising in" jurisdiction; and "related to" jurisdiction. *See* 28 U.S.C. § 1334(b). "Arising under" jurisdiction exists when the proceeding invokes a substantive right created by federal bankruptcy law. *See, e.g., Browning v. Levy,* 283 F.3d 761, 773 (6th Cir. 2002). On the other hand, "[a] claim 'arises in' bankruptcy if, by its very nature, the claim can only be brought in a bankruptcy action, because it has no existence outside of bankruptcy." *Sterling Vision, Inc. v. Sterling Optical Corp. (In re Sterling Optical Corp.),* 302 B.R. 792, 801 (Bankr. S.D.N.Y. 2003). Finally, "[j]urisdiction under 28 U.S.C. § 1334(b)'s 'related to' prong rests where the proceeding's outcome could conceivably have any effect on the estate being administered in bankruptcy." *Russian Media Group, LLC v. Echostar Commc'ns Corp.,* No. 3:03-CV-1263 (WWE), 2009 WL 4036849, at *4 (D. Conn. Nov. 19, 2009) (citation and internal quotation marks omitted). "[C]ore proceedings are those proceedings that arise in a bankruptcy case/or [arise] under Title 11 [within the purview of Section 1334(b)]." *Stern,* 131 S. Ct. at 2605. A matter that neither "arises

- 40 -

under" title 11 nor "arises in" a title 11 case but is merely "related to" the title 11 case within the

purview of Section 1334(b) is a non-core proceeding.  *See* 28 U.S.C. § 157(b)(3).

## ii.   <u>Postconfirmation Jurisdiction</u>

For postconfirmation jurisdiction to exist with respect to a proceeding, first, the confirmed

plan must provide that the bankruptcy court will retain jurisdiction over the proceeding

postconfirmation and second, the proceeding otherwise must fall within the ambit of the court's

Section 1334 jurisdiction.[32]  *See In re Metro-Goldwyn-Mayer Studios Inc.,* 459 B.R. 550, 556

(Bankr. S.D.N.Y. 2011).  It is undisputed that the Plan contains an adequate retention of jurisdiction

provision.  Accordingly, the issue is whether there is subject matter jurisdiction here under Section

1334.

"[M]ost courts agree that once confirmation occurs, the bankruptcy court's jurisdiction [under

Section 1334] shrinks."  *Park Ave. Radiologists, P.C. v. Melnick (In re Park Ave. Radiologists,*

*P.C.),* 450 B.R. 461, 467 (Bankr. S.D.N.Y. 2011) (citation and internal quotation marks omitted).

As a general rule, the "future fate of the . . . [reorganized debtor is] not within the control of the

bankruptcy court, nor . . . [can] that court reserve power to adjudicate controversies in which it might

become involved . . . ," *In re Ambassador Hotel Corp.,* 124 F.2d 435, 436 (2d Cir. 1942).  As the

Second Circuit further said almost seventy years ago:

> We have had occasion before to deplore the tendency of District Courts to keep
> reorganized concerns in tutelage indefinitely by orders purporting to retain
> jurisdiction for a variety of purposes, extending from complete supervision of the
> new business to modifications of detail in the reorganization.  Since the purpose of
> reorganization clearly is to rehabilitate the business and start it off on a new and
> to-be-hoped-for more successful career, it should be the objective of courts to cast

---

[32]     The reason why the "effect on the estate" test usually is inappropriate for
postconfirmation proceedings is explained in *Binder v. Price Waterhouse & Co., LLP (In re Resorts
Int'l., Inc.)*, 372 F.3d 154, 164-67 (3d Cir. 2004).

off as quickly as possible all leading strings which may limit and hamper its activities and throw doubt upon its responsibility. It is not consonant with the purposes of the [Bankruptcy] Act, or feasible as a judicial function, for the courts to assume to supervise a business somewhat indefinitely.

*North Am. Car Corp. v. Peerless Weighing & Vending Mach. Corp.,* 143 F.2d 938, 940 (2d Cir. 1944) (citations omitted). *See also Penthouse Media Group v. Guccione (In re General Media, Inc.),* 335 B.R. 66 (Bankr. S.D.N.Y. 2005).[33]    However, "[a] party can invoke the authority of the bankruptcy court to exercise post confirmation jurisdiction if the matter has a close nexus to the bankruptcy plan." *Ace Am. Ins. Co. v. DPH Holdings Corp. (In re DPH Holdings Corp.),* 448 Fed. Appx. 134, 137 (2d Cir. Nov. 29, 2011), *cert. denied,* 133 S. Ct. 51 (2012) (summary order) (citations omitted). *See also Metro-Goldwyn-Mayer, supra* at 556 ("The 'close nexus' test is met when a matter affects the interpretation, implementation, consummation, execution, or administration of the confirmed plan . . . ." (citation and internal quotation marks omitted)).

There appears to be a disagreement between (or possibly among) the Courts of Appeal in that at least one circuit limits the "close nexus" requirement to non-core proceedings. *See Geruschat v. Ernst Young LLP (In re Seven Fields Dev. Corp.),* 505 F.3d 237, 260 (3d Cir. 2007) ("[T]he 'close nexus' standard only applies for the purposes of determining whether a federal court has jurisdiction over a non-core 'related to' proceeding in the post-confirmation context."). The Third Circuit adopted that approach as a matter of judicial efficiency and because that was the approach taken by the courts below. *See id.* at 257 n.18 ("We . . . find . . . [applying the close-nexus test] inefficient

---

[33]

Once the bankruptcy court confirms a plan of reorganization, the debtor may go about its business without further supervision or approval. The firm also is without the protection of the bankruptcy court. It may not come running to the bankruptcy judge every time *something unpleasant happens*.

*Id.* at 73 (citation omitted; emphasis added).

in situations like the one before us because a finding that the case [is core because it] 'aris[es] in'

bankruptcy would 'kill two birds with one stone' inasmuch as such a finding conclusively would

establish both subject matter jurisdiction and the bankruptcy court's authority to enter final orders.").

On the other hand, the Second Circuit has applied the "close nexus" requirement to both core and

non-core proceedings.  *See DPH Holdings,* 448 Fed. Appx. at 136-37 (After determining that the

matter was core, the court applied the "close nexus" test to find postconfirmation jurisdiction.).  *See*

*also Ace Am. Ins. Co. v. DPH Holdings Corp. (In re DPH Holdings Corp.),* 437 B.R. 88, 97

(S.D.N.Y. 2010) (court below also applying "close nexus" test).

      The court is aware that the Second Circuit's opinion in *DPH Holdings* is a summary order

which does "not have precedential effect," Second Circuit Local Rule 32.1.1(a).  However, because

that opinion is the only Second Circuit opinion to address the "close nexus" requirement and is

subsequent to the Third Circuit's decision in *Seven Fields,* the court deems following the Second

Circuit's opinion in *DPH Holdings* to be the wiser course.

      Determining whether the "close nexus" test has been satisfied is a fact sensitive endeavor.

*See, e.g., Equipment Finders Inc. of Tennessee v. Fireman's Fund Ins. Co. (In re Equipment Finders,*

*Inc. of Tennessee),* 473 B.R. 720 (Bankr. M.D. Tenn. 2012); *BWI Liquidating Corp. v. City of Rialto*

*(In re BWI Liquidating Corp.),*437 B.R. 160 (Bankr. D. Del. 2010); *In re WRT Energy Corp.,* 402

B.R. 717 (Bankr. W.D. La. 2007); *Kaye v. Dupree (In re Avado Brands, Inc.),* 358 B.R. 868 (Bankr.

N.D. Tex. 2006), *appeal denied,* 2007 WL 2241660 (N.D. Tex. Aug. 3, 2007); *Gilbane Bldg. Co.*

*v. Air Sys., Inc. (In re Encompass Servs. Corp.),* 337 B.R. 864 (Bankr. S.D. Tex.), *aff'd,* 2006 WL

1207743 (S.D. Tex. May 3, 2006).

      Accordingly, bankruptcy courts have identified the following *nonexclusive* factors
in determining whether post-confirmation jurisdiction exists . . . :

(1) whether the claim or dispute arose before or after confirmation;

(2) what provisions in the confirmed plan exist for resolving disputes and whether there are provisions in the plan retaining jurisdiction for trying these suits;

(3) whether the plan has been substantially consummated;

(4) the parties involved in the dispute;

(5) whether state law or bankruptcy law applies;

(6) whether the claims require the interpretation of the plan or the court's orders; and

(7) evidence of forum shopping.

*WRT Energy, supra* at 724 (emphasis added; citations omitted) (collectively, the "*WRT Energy* Factors*").

### c.      Application of Law to Fact

The *WRT Energy* Factors are analyzed below:

•      *Whether the claim or dispute arose before or after confirmation ("Factor 1").*  As noted above, to some unspecified degree, the claim/dispute asserted in the Complaint arose preconfirmation in part and postconfirmation in part.

•      *What provisions in the confirmed plan exist for resolving disputes and whether there are provisions in the plan retaining  jurisdiction for trying these suits ("Factor 2").*  As discussed above, (a) Article 10 of the Plan provides for resolving this dispute with the Town and (b) Article 14.5.B. of the Plan retains jurisdiction in this court over this suit.

- 44 -

• *Whether the plan has been substantially consummated ("Factor 3").*[34] On this record, the court is persuaded that the Plan has been substantially consummated. That the Debtor may not have sold all the property that the Plan contemplated ultimately would be sold is irrelevant. *See* 7 *Collier on Bankruptcy* ¶ 1101.02[3][b], at 1101-9 (adopting view that only transfers of property intended to be made at or about the time of the effective date fall within the purview of Section 1101(2)(A).)[35]

---

[34]    "[S]ubstantial consummation" means –

(A) transfer of all or substantially all of the property proposed by the plan to be transferred;

(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

(C) commencement of distribution under the plan.

(11 U.S.C.A. § 1101(2) (West 2013).

[35]    The Town argues that, when the Final Decree Application was filed by the Debtor on April 12, 2007, this chapter 11 case was so far administered (*i.e.,* fully administered) that a final decree should have issued and the case should have been closed pursuant to Rule 3022 of the Federal Rules of Bankruptcy Procedure. *Cf.* Fed. R. Bankr. P. 3022 ("After an estate is fully administered in a chapter 11 reorganization case, the court on its own motion or on motion of a party in interest, shall enter a final decree closing the case.").

> Entry of a final decree closing a chapter 11 case should not be delayed solely because the payments required by the plan have not been completed. Factors that the court should consider in determining whether the estate has been fully administered include (1) whether the order confirming the plan has become final, (2) whether deposits required by the plan have been distributed, (3) whether the property proposed by the plan to be transferred has been transferred, (4) whether the debtor or the successor of the debtor under the plan has assumed the business or the management of the property dealt with by the plan, (5) whether payments under the plan have commenced, and (6) whether all motions, contested matters, and adversary proceedings have been finally resolved.

Fed. R. Bankr. P. 3022 Advisory Committee Note.

The Town places great evidentiary weight on the Final Decree Application as an admission by the Debtor that this case was "fully administered" within the purview of Rule 3022. However, the court never acted on the Final Decree Application and it was "marked off" by the Debtor on June 18, 2008 as discussed above. (*See supra* note 15 and accompanying text.) Accordingly, because of

- 45 -

- *The parties involved in the dispute ("Factor 4").*   The plaintiff in this proceeding is the Debtor and the Defendant is the Town.  As discussed above, the adversarial relationship between those two parties goes back to prepetition times (*i.e.,* predates the commencement of this chapter 11 case).

- *Whether state law or bankruptcy law applies ("Factor 5").*  The claims for relief asserted in the Complaint arise under state law.

- *Whether the claims require the interpretation of the plan or the court's orders ("Factor 6").* Such claims do not require the interpretation of the Plan or of this court's orders.[36]

- *Evidence of forum shopping ("Factor 7").*   The Town argues that maintaining jurisdiction over the Supervised Causes of Action was the primary motivation for the long-term structure of the Plan.  There is insufficient evidence in the record to support a finding of such (or other) forum shopping by the Debtor.  Moreover, although the insiders have waived current distribution on one occasion, there is insufficient evidence to support a finding that the ten-year term of the Plan has been extended (assuming that such is possible).

### i.   **Postconfirmation Claims**

To the extent that the Complaint alleges postconfirmation claims, Factors 1, 3, 5 and 6  in

some degree militate against jurisdiction.  Factors 2 and 4 militate in favor of jurisdiction.  Factor 7

is neutral.  The court finds Factors 1, 3, 5 and 6 to be the more persuasive here.  As noted above, the

---

the ambiguous circumstances surrounding the Final Decree Application, the court gives little weight to any admission or inference arguably contained therein (including with respect to evidence of forum shopping).

Moreover, in the Final Decree Application the Debtor asked the court to close the case but to reserve jurisdiction over the Contested Matter.  (*See* Case ECF No. 324 at 3 ¶ 5.)  The court could have proceeded on the Final Application in one of two ways: the court could have denied the Final Decree Application because the Contested Matter was pending; or the court could have granted the Final Decree Application with a reservation of jurisdiction with respect to the Contested Matter. Neither would advance the Town's jurisdictional attack here.

[36]      It is true that the interpretation of the Compromise Agreement may be germaine to this proceeding.  However, the Compromise Agreement is a state-law contract, and not an order of this court.  *See In re New England Nat., LLC,* No. 10-3033, 2011 WL 5041500, at *3 (Bankr. D. Conn. Oct. 24, 2011) ("[T]he Order [approving the Compromise Agreement] made reference to and approved the Compromise Agreement but did not incorporate the Compromise Agreement. The . . . [Compromise Agreement], therefore, cannot be given the force and effect of a court order.").

Complaint alleges solely state law claims. While the Debtor and the Town are old (*i.e.*, prepetition) adversaries, the Debtor would turn this court into its special "Town Land Use" court whenever a postconfirmation land use dispute with the Town arises during the Plan's term. The court is not persuaded that such is necessary to Plan implementation.[37] Rather, "something unpleasant" may have happened to the Debtor here postconfirmation. That does not establish a "close nexus" with the reorganization proceedings, and does not make it proper for the purely postconfirmation state law claims alleged in the Complaint to be adjudicated under Section 1334(b) jurisdiction.

### ii.   <u>Preconfirmation Claims</u>

To the extent that the Complaint alleges preconfirmation claims, Factor 1 in some degree militates in favor of jurisdiction. Factor 2 militates in favor of jurisdiction. Factor 3 militates against jurisdiction. Factor 4 militates in favor of jurisdiction. Factor 5 militates against jurisdiction. Factor 6 militates against jurisdiction. Factor 7 is neutral. The court finds those factors militating in favor of jurisdiction to be the more persuasive here.

Further, there is another factor in play here which also militates in favor of jurisdiction. As discussed above, the Litigation Supervisor Agreement was annexed to the Plan as an exhibit. As such, it was incorporated by reference into the Plan. (*See* Case ECF No. 260 at 3 § 2.2.A.) Moreover, the court retains substantial controls over the Litigation Supervisor and the Litigation Supervisor Agreement postconfirmation: (a) court approval is required for settlements (*see* Case ECF No. 259 at 19 § 10.7); (b) court approval is required for retention of additional or replacement counsel (*see id.* § 10.6.B.); (c) court approval is required for resignation by the Litigation Supervisor

---

[37]     For example and as discussed above, the Debtor took the position in the Disclosure Statement that "[w]hile serious litigation with . . . [the Town] seems likely given the history of the Debtor's effort to obtain the necessary development approvals, the successful implementation of the Plan is not dependent on [litigation] success," ECF No. 260 at 19 § 8.0.

(*see id.,* Exh. A. § 5.2); and (d) court approval is required for appointment of successor Litigation

Supervisor (*see id.,* Exh. A. § 5.4).  Further, "[t]he [Litigation Supervisor] Agreement will terminate

only upon authorization of the Bankruptcy Court," (*id.* § 7.1).  Finally, the Litigation Supervisor acts

"in the name of and on behalf of the Debtor for the purpose of implementing such portions of the

Confirmed Plan as require the reduction of the Causes of Action to settlement or judgment and the

distribution of the Net Proceeds or Recoveries derived therefrom," (*id.* at § 2.2).  Here, the Litigation

Supervisor is doing exactly what the Plan contemplated: attempting to reduce the Supervised Causes

of Action to judgment.  Accordingly, the Complaint does not "affect[] only matters collateral to the

bankruptcy process," *In re Resorts Int'l, Inc.,* 372 F.3d at 169, but, rather, bears a close nexus to

those proceedings, *see id.* at 168-69.

One further note.  As is apparent from the law discussed above, an attack on a plan's

retention of jurisdiction provisions is a permissible collateral attack on a confirmed plan.  However,

the Town insinuates that the Plan should not have been confirmed at all because the long-term

reorganization provided therein was unnecessary and/or benefitted only insiders.  That argument is

an attack on the merits of Plan confirmation and, as such, constitutes an *impermissible* collateral

attack on the confirmed Plan.  *Cf. United Student Aid Funds, Inc. v. Espinosa,* 559 U.S. 260 (2010)

(Trial court's legal error in confirming a chapter 13 plan which provided for the discharge of a

student loan contrary to 11 U.S.C. § 523(a)(8) did not render the plan confirmation void.); 11 U.S.C.

§ 1129(a)(3) (court required to find "good faith" as a condition to plan confirmation).  Accordingly,

the Town's insinuations in that regard are inapposite.

### d.    Conclusion

For the reasons discussed above, the court concludes that: (a) to the extent that the Complaint

alleges postconfirmation claims, this court lacks jurisdiction under 28 U.S.C. § 1334(b) to hear the

Complaint; and (b) the court also concludes that, to the extent that the Complaint alleges preconfirmation claims, this court has jurisdiction under 28 U.S.C. § 1334(b) to hear the Complaint.

**B.    Ability of this Court To Enter a Final Order or Final Judgment in this Proceeding**

As noted above, the Complaint alleges that "the cause of action under [Bankruptcy] Code Section 542" is a core proceeding under the following subsections of Section 157(b):

• Section 157(b)(2)(A) - "matters concerning administration of the estate"

• Section 157(b)(2)(C) - "counterclaims by the estate against persons filing claims against the estate"

• Section 157(b)(2)(E) - "orders to turn over property of the estate"

• Section 157(b)(2)(O) - "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims"

As the Plan and Disclosure Statement disclose, the Town's tax claim against the Debtor was paid in full during the case (and prior to Plan confirmation)[38] without prejudice to the Debtor's right to seek a tax refund under 11 U.S.C. § 505.  The Debtor did just that when it filed the Contested Matter on April 12, 2007.  (*See* Case ECF No. 325.)  That tax refund matter may have been a core proceeding within the purview of Section 157(b).  However, the foregoing does not help the Debtor

---

[38]    *See* ECF No. 259 at 7 § 3.1 ("Pursuant to the [July 21, 2004] Order entered by the Court approving the partial compromise and settlement entered into by and among Vespera . . ., the Debtor . . . and the Town, the Debtor and Vespera paid th[e Town's] Claim . . . . No further Dividend shall be paid to the Town.")  *See also* ECF No. 260 at 6 § 3.4.B.(1) ("Class 1 or the East Lyme Tax Claim Class.  The Claims held by the Creditor at the inception of this case have been compromised and paid by Vespera.")

here because the tax refund claim is not stated in the Complaint and, thus, the lawsuit is not "about"

the tax refund claim. *Cf. Systems Eng'g,* 252 B.R. at 643.[39]

### 1.   Analysis

#### a.   Prepetition Claims

The Debtor alleges that the Complaint is a counterclaim and a "core proceeding" under

Section 157(b)(2)(C). As noted above, the Town filed a proof of claim in this case. However, also

as noted above, the Town has not had a claim against the estate since some time prior to Plan

confirmation. As a result, the Debtor's claim against the Town is not "counter" to anything within

the purview of Section 157(b)(2)(C). The court will not pretend otherwise. Accordingly, the claims

alleged by the Debtor against the Town in the Complaint are not "counterclaims" within the purview

of Section 157(b)(2)(C). Moreover, as discussed above, the Complaint does not state a Section 542

turnover claim. (*See supra* note 5.)

When viewed realistically, the Complaint as stated bears a striking resemblance to *Marathon

Pipe, supra.* In *Marathon Pipe,* the Supreme Court held that a bankruptcy judge appointed for a term

of years could not enter a final judgment with respect to a chapter 11 debtor's claim against a non-

consenting third party for breach of contract and warranty, misrepresentation, coercion and duress

because such power would be contrary to the lifetime tenure provision of Article III of the United

States Constitution. *See Marathon Pipe, supra.* Here, the Debtor's allegations with respect to

Section 157(b)(2)(C) and 157(b)(2)(E) being deemed inapposite for the reasons discussed above, the

---

[39]     The court assumes (for analytical purposes only) that the tax refund claim is not in
the Complaint as a consequence of the Compromise Agreement. The court is aware of Section 16
of the Compromise Agreement (set forth *supra*). It is the conclusion of the court that Section 16 is
too ambiguous to constitute the Town's consent or waiver with respect to this court's entry of final
orders or a final judgment in this proceeding.

Debtor also alleges that the Complaint is a "core proceeding" under Sections 157(b)(2)(A) ("matters concerning administration of the estate") and Section 157(b)(2)(O) ("Other proceedings . . . "). Section 157(b)(2)(A) and/or (O) might be satisfied if the Complaint were deemed to raise claims that arose "in" the case. However, the relevant claims are prepetition claims and can exist outside of bankruptcy. Further, it must be remembered that, under the Plan, liquidation of the Supervised Causes of Action is not the sole means of funding Dividends but, rather, Dividends also may be funded from the Debtor's postconfirmation business operations. (*See, e.g.,* Case ECF No. 259 at 18 § 10.5 (B).) Given the Plan and other record here, the court is not persuaded that prepetition claims alleged in the Complaint are so essential to the Debtor's reorganization that they fall within the purview of either Section 157(b)(2)(A) or Section 157(b)(2)(O).

### b.   Postpetition but Preconfirmation Claims

As noted above, counsel for the Debtor took the position at oral argument that the Complaint covered postpetition/preconfirmation conduct as well as prepetition and postconfirmation conduct. Postpetition/preconfirmation claims might be deemed "core" if they are deemed to arise "in" the case. However, there is no way for the court to verify counsel's statement. That is because (a) the Complaint does not contain relevant date-specific allegations and (b) the Debtor has not directed the court to specific, relevant portions of the record for support. Accordingly, the Debtor has failed to demonstrate that *any* portion of the Complaint sets forth a core proceeding (the court not having jurisdiction over postconfirmation claims as discussed above).

### 2.   Conclusion

For the reasons discussed above, the court concludes that the Complaint is not a "core proceeding" within the purview of Section 157(b)(1). Moreover, as noted above, the Town does not

consent to this court's entry of final orders or a final judgment with respect to the Complaint.

Accordingly, the court concludes that it cannot enter such final orders or final judgment.[40]

### C.  **Permissive Abstention**

#### 1.  **Applicable Law**

The Town seeks so-called "permissive abstention" under 28 U.S.C. § 1334(c)(1).  Section

1334(c)(1) provides in relevant part as follows: "[N]othing in this section prevents a district court

in the interest of justice, or in the interest of comity with State courts or respect for State law, from

abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case

under title 11."  28 U.S.C.A. § 1334(c)(1) (West 2013).

> Pursuant to 28 U.S.C. § 1334(c)(1), a court may abstain from hearing a
> proceeding within its jurisdiction "in the interest of justice, or in the interest of
> comity with State courts or respect for State law."  Permissive or discretionary
> abstention was intended to codify non-bankruptcy judicial abstention doctrines,
> which recognizes "the virtually unflagging obligation of the federal courts to exercise
> the jurisdiction given them."

> The movant bears the burden of establishing that permissive abstention is
> warranted.  The factors that inform the Court's discretion include the following:

> > (1) the effect or lack thereof on the efficient administration of the estate if a Court
> > recommends abstention, (2) the extent to which state law issues predominate over
> > bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law,
> > (4) the presence of a related proceeding commenced in state court or other
> > nonbankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C.
> > § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main
> > bankruptcy case, (7) the substance rather than form of an asserted 'core'
> > proceeding, (8) the feasibility of severing state law claims from core bankruptcy
> > matters to allow judgments to be entered in state court with enforcement left to the
> > bankruptcy court, (9) the burden of [the court's] docket, (10) the likelihood that
> > the commencement of the proceeding in a bankruptcy court involves forum

---

[40]    As discussed above, the undersigned has concluded that she cannot enter final orders
or a final judgment in this proceeding.  Accordingly, there is no possibility that the limits of
*Marathon Pipe* will be exceeded in this proceeding.  As a result, there is no *Stern* issue here.

shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of nondebtor parties.

"Not all of these factors need be applied, however." In addition, the "balance [of the factors] should be 'heavily . . . in favor of the exercise of jurisdiction.'"

*Hough v. Margulies (In re Margulies),* 476 B.R. 393, 401-02 (Bankr. S.D.N.Y. 2012) (alterations in original; citations omitted.).

### 2.    Application of Law to Fact

For its permissive abstention argument, the Town relies exclusively (or almost exclusively) upon the fact that this court cannot (as decided above) enter final orders or a final judgment in this proceeding. That fact, standing alone, does not support permissive abstention. Were it otherwise, Section 157(c)(1) ("A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11.") would be read right out of Section 157 whenever a defendant did not want to be before a bankruptcy judge in a non-core proceeding. The court is not in a position to determine whether other factors might warrant a permissive abstention here. That is because the Town has not adequately analyzed those factors (if any exist) and the court declines to make the Town's arguments for it. Accordingly, the court concludes that the Town has failed to establish that permissive abstention is warranted in this proceeding.

### 3.    Conclusion

For the reasons discussed above, the court concludes that permissive abstention under 28 U.S.C. § 1334(c)(1) is not warranted in this proceeding.

- 53 -

D.    **Necessary Parties**

1.    **Positions of the Parties**

The Town claims that the Compromise Agreement limits its liability with respect to the

Complaint to liability under Section 7-465 of the Connecticut General Statutes.   Section 7-465

provides in relevant part as follows:

> (a) Any town, city or borough, notwithstanding any inconsistent provision of law,
> general, special or local, *shall pay on behalf of any employee of such municipality*,
> except firemen covered under the provisions of section 7-308, and on behalf of any
> member from such municipality of a local emergency planning district, appointed
> pursuant to section 22a-601, *all sums which such employee becomes obligated to pay
> by reason of the liability imposed upon such employee by law for damages awarded
> for infringement of any person's civil rights or for physical damages to person or
> property*, except as set forth in this section, if the employee, at the time of the
> occurrence, accident, physical injury or damages complained of, was acting in the
> performance of his duties and within the scope of his employment, and if such
> occurrence, accident, physical injury or damage was not the result of any wilful or
> wanton act of such employee in the discharge of such duty . . . .

(Conn. Gen. Stat. Ann. § 7-465 (West 2013) (emphasis added).   Accordingly, the Town argues, the

Debtor must name the relevant "employee(s)" as a defendant(s) in order to obtain judgment on the

Town's statutory indemnification obligation to such "employee(s)."   The Town also notes that the

time for joining third-party defendants set in the Joint Pretrial Order has lapsed.   Further, the Town

argues, all applicable statutes of limitation with respect to such third parties have run.   Therefore,

the Town concludes, this adversary proceeding must be dismissed pursuant to Rule 12(b)(7) of the

Federal Rules of Civil Procedure (made applicable here by Fed. R. Bankr. P. 7012) for failure to join

a party under Rule 19."[41]

---

[41]    Rule 19 provides in relevant part as follows:

(a) *Persons Required To Be Joined If Feasible*

 (1) *Required Party*. A person who is subject to service of process and whose

The Debtor argues that the Town expressly or impliedly has waived or otherwise forfeited

its rights under Rules 12(b)(7) and 19 by its actions or failures to act.  Moreover, the Debtor argues

that it has direct claims against the Town under Section 52-557n of the Connecticut General

Statutes.[42]  The Town responds that the Debtor released its direct claims (if any) pursuant to the

---

> joinder will not deprive the court of subject-matter jurisdiction must be joined as
> a party if:
>
> > (A) in that person's absence, the court cannot accord complete relief among
> > existing parties . . . .
>
> (2) *Joinder by Court Order*. If a person has not been joined as required, the court
> must order that the person be made a party. A person who refuses to join as a
> plaintiff may be made either a defendant or, in a proper case, an involuntary
> plaintiff.
>
> (3) *Venue*. If a joined party objects to venue and the joinder would make venue
> improper, the court must dismiss that party.
>
> (b) *When Joinder Is Not Feasible*. If a person who is required to be joined if feasible
> cannot be joined, the court must determine whether, in equity and good conscience,
> the action should proceed among the existing parties or should be dismissed . . . .

Fed R. Civ. P. 19.

[42]      Section 52-557n provides in relevant part:

(a)(1) Except as otherwise provided by law, a political subdivision of the state shall
be liable for damages to person or property caused by: (A) The negligent acts or
omissions of such political subdivision or any employee, officer or agent thereof
acting within the scope of his employment or official duties; (B) negligence in the
performance of functions from which the political subdivision derives a special
corporate profit or pecuniary benefit; and (C) acts of the political subdivision which
constitute the creation or participation in the creation of a nuisance; provided, no
cause of action shall be maintained for damages resulting from injury to any person
or property by means of a defective road or bridge except pursuant to section
13a-149. (2) Except as otherwise provided by law, a political subdivision of the state
shall not be liable for damages to person or property caused by: (A) Acts or
omissions of any employee, officer or agent which constitute criminal conduct, fraud,
actual malice or wilful misconduct; or (B) negligent acts or omissions which require
the exercise of judgment or discretion as an official function of the authority

- 55 -

Compromise Agreement and also asserts several other substantive defenses to such direct claims.

Needless to say, the Debtor disputes all of the foregoing.

### 2.    Disposition by the Court

The foregoing matters exceed in scope the Section 1334, Section 157 and *Stern* issues which

the court contemplated being raised in this procedural posture.  Moreover, the foregoing matters raise

questions of fact and/or mixed questions of law and fact which are beyond the scope of the Mini-

Trial.  (*See* PP ECF No. 248 at 4:18-20 ("This mini trial relates just to the 28 U.S.C. Section 1334

issue and then to the core matter issue." (statement of the court)).)  Accordingly, the court deems it

inappropriate to adjudicate the matters raised in subpart D.1, *supra* (collectively, the "Rule 19 Issue")

in the present procedural posture.  Therefore, the court will deny the Dismiss/Abstain Motion and

sustain the Objection to the extent both relate to the Rule 19 Issue, all without prejudice to the right

(if any) of the Town to raise the Rule 19 Issue in a more appropriate procedure posture.[43]

## IV.    CONCLUSION

For the reasons discussed above, (a) the Dismiss/Abstain Motion is *granted* to the extent that

the Complaint alleges postconfirmation claims and the Objection is *sustained* to the same extent, [44]

---

expressly or impliedly granted by law.

Conn. Gen. Stat. Ann. § 52-557(n) (West 2013).

The Debtor also suggests that the Town has stepped into the shoes of its insurer pursuant to
a settlement agreement between the insurer and the Town.  Accordingly, the Debtor argues, it has
a "direct action" against the Town just as (the Town claims) it would have had against the insurer.

[43]     The court has considered all of the remaining nonprevailing arguments of the parties
and finds them to be inapposite or otherwise inappropriate.

[44]     The extent of the dismissal will be clarified at the trial on the merits or in another
appropriate procedural posture.

and (b) the Dismiss/Abstain Motion is *denied* and the Objection is *sustained* with respect to the remainder of the Complaint; *provided, however,* (i) the court may not issue final orders or a final judgment in this proceeding but only shall submit proposed findings of fact and conclusions of law to the District Court with respect to the same and (ii) all of the foregoing is without prejudice to the right (if any) of the Town to raise the Rule 19 Issue in a more appropriate procedural posture.

It is **SO ORDERED**.


Dated: March 5, 2013                                 BY THE COURT


Lorraine Murphy Weil
Chief United States Bankruptcy Judge